IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 18, 2001 Session

## STATE OF TENNESSEE v. STEVEN KELLY MEZO

**Appeal from the Criminal Court for Sumner County**
**No. 901-1999   Jane Wheatcraft, Judge**

_____

### No. M2000-02760-CCA-R3-CD - Filed April 10, 2002

_____

The defendant, Steven Kelly Mezo, who was charged with two counts of the aggravated sexual battery of his daughter, A.M.,[1] was convicted of one count of aggravated sexual battery and one count of assault. The trial court ordered concurrent sentences of eight years and 11 months and 29 days, respectively.  In this appeal of right, the defendant asserts that (1) he was denied his constitutional right of assistance of counsel of his choosing; (2) he was denied the effective assistance of counsel with regard to a pre-trial settlement offer; (3) the evidence was insufficient; and (4) the trial court erred by admitting hearsay statements.

### Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

Gary M. Williams, Hendersonville, Tennessee (on appeal), and Randy P. Lucas, Gallatin, Tennessee (at trial), for the appellant, Steven Kelly Mezo.

Paul G. Summers, Attorney General & Reporter; Jennifer L. Bledsoe, Assistant Attorney General; and Sallie Wade Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

On September 12, 1999, Elizabeth Vasquez, who is the victim's maternal grandmother, Christina Shore, and the victim, age 12, reported to police an incident which had occurred on the preceding day.  A police investigation resulted in the arrest of the defendant for two counts of aggravated sexual battery.

At trial, Ms. Vasquez testified that she and the victim lived in a three-bedroom mobile home at the time of the incident.  The victim's two sisters and brother also lived with Ms. Vasquez, who

---

[1]It is this court's policy not to identify minor victims of sexual offenses.

had obtained temporary custody of the children approximately two and one-half years earlier. Ms. Vasquez recalled that her daughter, Lee Ann Mezo, and her son-in-law, the defendant, frequently stayed overnight with her while visiting the children. Another of Ms. Vasquez's daughters, Tracy Nunley, also lived at the residence. Ms. Vasquez testified that on September 11, 1999, the defendant and her daughters had done "[l]ots of drinking and drugs." Ms. Vasquez remembered that at approximately 11:00 or 11:30 p.m., the defendant went into a bedroom shared by the victim and her sister, T.M., who was already in the room asleep, and turned a radio on "really loud." At that point, Ms. Vasquez either asked the victim, who was still awake, to turn down the radio or the victim volunteered to do so on her own. Ms. Vasquez recalled that the victim was in the bedroom with the defendant for only five minutes or so and appeared to be "agitated" when she emerged from the room and asked to sleep with her that night. The next morning, Ms. Vasquez drove the victim to the residence of a friend, Christina Shore.

During cross-examination by defense counsel, Ms. Vasquez acknowledged that she had obtained custody of the children while her daughter was in intensive care due to a drug overdose. Ms. Vasquez agreed that the victim and the other children were upset with the defendant and their mother for drinking and using illegal drugs. She explained that she was unable to control either the defendant, who had just completed an in-house rehabilitation program, or her daughter in regard to drug usage because they "just did what they wanted to do." Ms. Vasquez testified that she had telephoned the police "many times" and understood that they were unable to help her.

Sixteen-year-old Christina Shore, who met the victim at church, testified that she and the victim have been "best friends" for two years. The victim stayed at her house on September 12, 1999, while the victim's grandmother was at work. Ms. Shore recalled that during that time, the victim informed her that the defendant had asked her for a hug the night before and then touched her breasts. She described the victim as crying, scared, uncomfortable, and concerned that she was at fault. Later, Ms. Shore accompanied the victim and her grandmother to the police station to report the incident. She acknowledged that the victim had expressed disappointment that the defendant had completed a rehabilitation program and then relapsed into drug and alcohol use.

The victim, who has generally lived with her grandmother, Ms. Vasquez, as the result of her parents' drug addictions, testified that in the late summer of 1998, she woke up to find the defendant lying beside her on her bed, rubbing one of her breasts over her clothing. When the victim, clad in a t-shirt and jeans because she habitually slept in her clothes, awoke, the defendant said nothing and left the room. She described the episode as making her feel "nasty." According to the victim, there was no other inappropriate touching by the defendant until the September 11, 1999, incident when her mother and the defendant were "kind of" living at her grandmother's residence. The victim testified that her parents drank and used drugs and that she and her siblings had found marijuana and crack cocaine in their possession. She recalled that on September 11, the defendant and her mother drank during the day and began using drugs during the evening. The victim stated that the defendant entered the bedroom that she shared with her sister, T.M., and turned on the radio. Unlike Ms. Vasquez, she described the volume of the radio as "not really loud at all." The victim testified that she went into the bedroom and that the defendant hugged her under her arms and then touched a

breast "just long enough to let [her] know . . . he meant to do it." The victim then slept with her grandmother that evening, but did not tell her what had occurred. She recalled that on the next day, she informed Christina Shore of the incident. Ms. Shore and the victim's grandmother almost immediately reported the incident to the police. The victim explained that she loved the defendant and conceded that she was disappointed with his drinking and use of drugs.

On cross-examination, the victim acknowledged that she had stayed at the Shore residence "a lot" prior to the September 11 incident. She agreed that she had not seen the defendant very often because he was a truck driver and because he had just spent time in an in-house rehabilitation program and a halfway house. The victim testified that while she had not seen any drugs in her grandmother's home at the time of the last incident, she believed that the defendant and her mother were using drugs in the back bedroom, which was their habit. The victim was unable to explain why she did not immediately report the September 11 incident to her grandmother. She related that the first incident of abuse took place sometime between the end of the school year and her birthday; she testified that she knew the defendant had been drinking at that time because there was a beer bottle on her dresser. After the last occurrence of abuse, the victim moved into the Shore residence and then into foster care. She had problems in foster care, particularly with care for her younger sister, and admitted that she was removed from the home "because they thought [she] was lying."

Detective Stan Hilgadiack of the Gallatin Police Department, who interviewed the defendant after the victim reported the offenses, testified that the defendant waived his Miranda rights and gave a recorded statement on September 24, 1999. In the statement, the defendant maintained that he had no recollection of inappropriately touching the victim, explaining that "the only thing [he could] figure is [that he] blacked out." He asserted that he "never felt that way towards [the victim]." While the defendant admitted that he was drinking on September 11th, he denied that he had used cocaine or crack. When confronted by police with the victim's allegations that he had rubbed her breast in the fall of 1998, the defendant again denied recollection, reasoning that he "was probably asleep or passed out and . . . might have mistake[n] [the victim] for [his] wife . . . before [he] caught it." The defendant informed the detective that he did not know whether the victim might fabricate such allegations, but believed that she would not do so.

Janetta Sue Ray, who provided foster care for the victim, testified on behalf of the defense. Ms. Ray recalled that the victim moved into her home just prior to Thanksgiving of 1999 and stayed there for five to six days. At that time, she had a number of children in her home and was in the process of packing and listing her house on the real estate market. Ms. Ray testified that the victim was, therefore, sometimes required to watch her younger sister, but she denied that she required the victim to supervise her sister on a full-time basis. Ms. Ray stated that there was always food in the house available to the victim.

The defendant, 30 years of age, testified that he lived with his parents and had been a truck driver for approximately three and one-half years. He acknowledged that he began drinking and smoking marijuana when he was in his teens and that he first tried crack cocaine some three to four years earlier. He stated that as a result of his substance abuse, he had lost his wife and children.

According to the defendant, he first learned of the victim's allegations against him after receiving a letter from his wife. He responded to the letter, asserting that he could not believe that he could have done anything like that. The defendant maintained that he gave a statement to police because he felt as though he had nothing to hide. He stressed that he had never admitted to the victim's allegations. He denied that he touched the victim in a sexual manner on September 11. The defendant contended that he had gone into the front bedroom to listen to the radio when the victim came in and said, "Cut down the radio. They want you to cut down the radio." He recalled that he asked for a hug and then gave the victim a "bear hug." According to the defendant, the victim became aggravated and left the room. He insisted that he had never meant to touch the victim in a sexual manner. The defendant denied having used drugs on September 11, claiming that he was only drinking beer and was not in possession of any crack cocaine. He stated that he had spent 21 days in the PathFinder recovery program and 30 days in a halfway house just prior to the incident. He admitted that he had begun to use alcohol and drugs again with his wife. The defendant testified that his family had informed him that the victim was particularly upset about his relapse.

Upon cross-examination by the state, the defendant admitted that he had used alcohol and drugs in front of his children and that he had blackouts "every once in a while." He acknowledged that he told police that he could not recall either of the two incidents and that he did not think the victim would fabricate the allegations. He conceded that he could not initially recall the September 11 incident when questioned by police, but contended that his memory of the events had improved during the eight months before trial. The defendant admitted that he had been drinking prior to both incidents of abuse.

At the time of trial, Paula McKoin, the defendant's sister, had custody of all of the defendant's children with the exception of the victim. She recalled that she was aware that the defendant was drinking and using drugs during the period of time between summer 1998 and September of 1999. Ms. McKoin described the defendant as calm and relaxed when drinking and testified that he became overly affectionate when he drank too much. She claimed that she had never seen the defendant do anything inappropriate to the victim or his other children.

Paul Mezo, the defendant's father, testified that when the defendant was drunk, he "want[ed] to hug on you, love on you." Mezo stated that the defendant's hugs often made him uncomfortable because the defendant would not let go. He denied that they were sexual in nature and asserted that he had never seen any inappropriate sexual behavior between the defendant and the victim or the other children.

I

Citing the Sixth Amendment to the United States Constitution and Article I, § 9 of the Tennessee Constitution, the defendant asserts that he was erroneously denied the right to retain counsel of his own choice when the trial court refused to continue the trial at the request of his private counsel. The state contends that the trial court did not abuse its discretion by denying the continuance.

This case was initially set for trial on June 26, 2000. On June 14, 2000, the defendant filed a motion to continue, asserting that he had hired new counsel after his parents had posted bail some 13 days earlier. Substitute counsel, Gary Williams, appeared at the hearing on the motion, stated that he had a schedule conflict on the trial date, and asserted that even if the conflict was resolved, he did not have sufficient time to prepare in the remaining two weeks. The defendant complained that while he was in jail for nearly seven and one-half months, his appointed counsel visited him on only two occasions for fifteen minutes each. The defendant claimed that he was uncomfortable going to trial due to the lack of communication with his appointed counsel and insisted that he was not seeking to delay the trial in order to extend his time on bail. The defendant testified that he had sought substitute counsel three or four days after his release and acknowledged that he had not made any other attempt to hire another lawyer after learning that Attorney Williams would be unavailable on the trial date. The defendant admitted that he had received copies of discovery from his appointed counsel. The trial court denied the motion, finding as follows:

> [The defendant] was in jail for seven and a half months. At no point did he ever say to this [c]ourt . . . my attorney is not coming to see me; I am not happy with my counsel; I want new counsel, but he has never raised an objection to his counsel.
>
> I appointed Mr. [Randy] Lucas because it's a very, very serious case, and I trusted that he would do a conscientious job because I appoint him a great deal because he is conscientious; and he is always well prepared when he comes into this courtroom.
>
> I will not continue this case. I don't think there's any reason to continue it. I have every reason to believe that Mr. Lucas will be perfectly competent counsel and that he will be prepared.
>
> I just have to consider the fact that this has been set for months; and that no objection was raised to counsel prior to the time that [the defendant] got out of jail; and now to come in here thirteen days before trial and ask this [c]ourt to continue it is not fair to the [s]tate.
>
> It is not fair to the victim in this case, and I have to consider the fact that the victim has been through a lot. The victim has waited a long time for this case to come to trial . . . .

Later, in ruling on the defendant's motion for new trial, the trial court stated as follows:

> This court feels very strongly in all cases but especially the cases involving child witnesses that it's not fair to keep continuing and continuing cases and getting these children psychologically as well as physically prepared to go to trial and then pulling the rug out from under them.

Initially, the defendant's claim requires this court to balance competing interests. A criminal defendant has a right to retain counsel of his choice. See State v. Zyla, 628 S.W.2d 39, 41-42 (Tenn. Crim. App. 1981) (quoting United States v. Burton, 584 F.2d 485, 489-90 (D.C. Cir. 1978)). That right, however, is not absolute:

> The right "cannot be insisted upon in a manner that will obstruct an orderly procedure in courts of justice, and deprive such courts of the exercise of their inherent powers to control the same." The public has a strong interest in the prompt, effective, and efficient administration of justice; the public's interest in the dispensation of justice that is not unreasonably delayed has great force.
>
> We recognize that the right to choice of counsel devolves not only from the due process clause of the Fifth Amendment but also from the more stringent and overlapping standards of the Sixth Amendment. This, however, does not alter the fact that the determination of whether the defendant's right to select his counsel was protected depends upon the circumstances of the particular case. Once a fair and reasonable initial opportunity to retain counsel has been provided, and adequate counsel obtained, the court, mindful of the accused's interest in having counsel in whom he has confidence, is free to deny a continuance to obtain additional counsel if, upon evaluation of the totality of the circumstances, it reasonably concludes that the delay would be unreasonable in the context of the particular case.

Id.; see also Daylon Demetric Roberts v. State, No. E1999-02180-CCA-R3-PC (Tenn. Crim. App., at Knoxville, Dec. 1, 2000). A motion for continuance of a criminal trial until retained counsel can be present is directed to the sound discretion of the trial court. Zyla, 628 S.W.2d at 41.

In our view, the trial court did not abuse its discretion by denying the defendant's motion to continue. The defendant was initially incarcerated on November 12, 1999. His appointed counsel visited him at the jail on an unrelated forgery charge on November 12, 1999. On the 19th of November, the defendant executed a Uniform Affidavit of Indigency form and, in the space for the name and address of any lawyer he had seen or attempted to hire, he wrote "[a]ppt. Randy Lucas on previo[u]s charge." Attorney Lucas was then appointed to represent him that same day. During the course of the representation, the defendant did not inform the trial court of any concerns about the effectiveness of his appointed counsel. On March 6, 2000, the trial court set this matter for trial for June 26 of the same year. For more than three months following the setting, the defendant did not communicate any dissatisfaction with his appointed attorney. On June 1, the defendant's parents made a cash bond and the defendant was released from jail. On June 14, Attorney Williams filed an appearance and a motion to continue the trial date. At the hearing on the motion, the defendant's father testified that he and his wife did not bail the defendant out of jail earlier because they had been told by "law enforcement professionals" that he should stay where he was. Their advice was that "getting him out" would not help. In our view, the trial court correctly balanced the various interests at stake. The defendant had been indicted in November and the case had been set for trial since March. The offenses involved a child victim, specifically the daughter of the defendant, and the

possibility of further trauma was a concern. The defendant did not raise any issue with regard to the effectiveness of appointed counsel until such time as he was released from jail and his parents offered to retain private counsel. The trial court assessed appointed counsel as "conscientious" and "always well prepared." Attorney Williams understood that he had a conflict when he conditionally agreed to represent the defendant and made a value judgment as to which of two competing events should take precedence. Upon learning that Attorney Williams either could not or would not resolve the conflict, the defendant did not attempt to seek other private counsel who may have been available on the appointed trial date. There was no error.

## II

Next, the defendant claims that he was denied the effective assistance of counsel with regard to a plea offer made by the state just prior to trial. He argues that counsel should have advised him that the offer was reasonable in light of his inability to recall whether he had committed the charged offenses.

When a defendant seeks relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Second, he must show that the deficiencies "actually had an adverse effect on the defense." Strickland v. Washington, 466 U.S. 668, 693 (1984). Should the defendant fail to establish either factor, no relief is warranted. As to guilty pleas, the defendant must establish a reasonable probability that, but for the errors of his counsel, he would not have entered the plea and would have insisted on going to trial. Hill v. Lockhart, 474 U.S. 52, 59 (1985).

The claim of ineffective assistance of counsel is a mixed question of law and fact and subject to de novo review; however, a trial court's findings of fact, while reviewed de novo, include a presumption of correctness unless the preponderance of the evidence is otherwise. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Conclusions of law are reviewed under a de novo standard. Id. Appellate courts may neither reweigh nor re-evaluate the evidence or substitute their own inferences for those drawn by the trial court. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997).

At the hearing on the defendant's motion for new trial, Attorney Randy Lucas testified that the state made a plea offer as the defendant was entering the courthouse on the morning of trial. Attorney Lucas recalled that the offer was for six years with no additional jail time beyond that already served. Lucas recalled that when he conveyed the offer to the defendant, the defendant's parents and several other family members were present. He stated that he advised the defendant that the proposal "was as good an offer as he could expect." Attorney Lucas testified that the defendant asked whether he would be required to register as a sex offender and that when the assistant district attorney general confirmed that he would, he replied that he was not interested in the plea agreement. When questioned regarding the specific advice he gave the defendant, Attorney Lucas stated as follows:

What I told him was that he had always told me that he didn't do this or that he couldn't remember doing it. And I said to him that: If there was any doubt in his mind as to whether he did it, this is a good offer. As long as you tell me "I didn't do it," you can't accept any offer.

\*    \*    \*

I told him that if there was any possibility in his mind that he could have done this, he needed to consider that offer. I did not tell him that if he didn't remember he shouldn't consider the offer.

Attorney Lucas recalled that the jury was already waiting at the time of the offer and that the defendant, therefore, had ten minutes or less to consider the plea.

Paul Mezo testified that he was on the courthouse steps with the defendant the morning of trial when Attorney Lucas came out and informed the defendant that there had been "another" offer from the state. He recalled that the terms of the offer were six years with no additional jail time. Mezo stated that Lucas offered the defendant the following advice: "If you done it, it's a good deal. If you didn't do it, it's not such a good deal." He estimated that the defendant had five minutes to consider the offer.

David Blankenship, the defendant's uncle, was present when the offer was conveyed to the defendant. He recalled that the "lawyer told him he could walk that day if he would take the plea bargain and go to a rehabilitation center." Blankenship remembered that Attorney Lucas advised the defendant that it was a "good deal," but that he should not accept the offer if he did not agree.

The defendant testified that he was outside smoking a cigarette before trial when his counsel advised him that the state had made a plea offer of six years, time served. He maintained that his counsel advised him, "If I thought I did it, it would be a good deal. If I didn't think I did it, it wouldn't be a good deal." The defendant estimated that he had five minutes to consider the offer. On cross-examination by the state, the defendant admitted that the requirement that he register as a sex offender was part of his motivation in rejecting the offer. He acknowledged that he had discussed whether there was any way to avoid the requirement and stated that he did not want to register because he had no independent recollection of either event and did not believe that he was guilty.

The trial court ruled on the issue as follows:

The offer . . . conveyed I think was conveyed fairly, and I think that Mr. Mezo knowingly turned it down, even knowing that it was a six years at 30 percent and apparently a time served sentence. I believe and certainly the testimony today bears out the fact that he did not want to have to register as a sex offender, and he determined that based on that he would turn down the offer and take his chances before a jury, knowing that he had made various statements to the detectives that he did not remember what had gone on.

In our view, the defendant has failed to establish that his appointed counsel's advice regarding the last-minute settlement offer by the state fell below "the range of competence demanded of attorneys in criminal cases." The record demonstrates that counsel advised the defendant that he considered the offer to be a good one and counseled the defendant to consider it. Attorney Lucas's concern that the defendant should not plead guilty while maintaining his innocence was a valid one. In addition, the defendant has failed to prove that he suffered any prejudice, i.e., that but for appointed counsel's erroneous advice, he would not have pled guilty and would have insisted on going to trial. The trial court found that the defendant rejected the state's offer in part due to the requirement that he register as a sex offender. The evidence supports that finding.

### III

The defendant next asserts that the evidence was insufficient to support his convictions. The state disagrees.

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

The defendant was charged with two counts of aggravated sexual battery. The jury convicted the defendant as charged on the first count, which arose out of the summer 1998 incident. Aggravated sexual battery is unlawful sexual contact with a victim by the defendant under any of the following circumstances:

> (1) Force or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon;
> (2) The defendant causes bodily injury to the victim;
> (3) The defendant is aided or abetted by one (1) or more other persons; and
> > (A) Force or coercion is used to accomplish the act; or
> > (B) The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless; or
> (4) The victim is less than thirteen (13) years of age.

Tenn. Code Ann. § 39-13-504(a). "'Sexual contact' includes the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6). The victim testified that during the summer of 1998, she awakened to find the defendant in her bed rubbing her breasts over her t-shirt. It is undisputed that the victim was under 13 years of age. The defendant complains that because there was no conversation during the incident, there was no evidence that the touching was for the purpose of sexual arousal or gratification. In our view, however, there was evidence from which the jury could have reasonably inferred the purpose of the defendant.

On the second count, arising from the September 11, 1999, incident, the jury convicted the defendant of the lesser included offense of assault. Tennessee Code Annotated § 39-13-101 defines the offense of assault as follows:

> (a) A person commits assault who:
> (1) Intentionally, knowingly or recklessly causes bodily injury to another;
> (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or
> (3) Intentionally or knowingly causes physical contact with another and reasonable person would regard the contact as extremely offensive or provocative.

Tenn. Code Ann. § 39-13-101(a). Here, the victim testified that the defendant touched one of her breasts after hugging her and that he let his hand linger there. In our view, a rational trier of fact could have concluded that the defendant was guilty of assault.

IV

Finally, the defendant maintains that the trial court erred by admitting certain hearsay evidence through Christina Shore and Elizabeth Vasquez. During a jury-out hearing, defense counsel objected to Ms. Shore's testimony that the victim had confided that the defendant had touched her inappropriately on the previous evening. The trial court overruled the objection, finding that the statements fell within the excited utterance exception to the hearsay rule. The defendant contends that the statements do not fall within the exception because they were not made until the next day.

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," Tenn. R. Evid. 801(c), and is generally inadmissible, Tenn. R. Evid. 802. "The following are not excluded by the hearsay rule: . . . [a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2). In State v. Gordon, 952 S.W.2d 817, 820 (Tenn. 1997), our supreme court observed that there are three requirements of the excited utterance hearsay exception: (1) that there be a startling event or condition; (2) that the statement "relate to" the startling event or condition; and (3) that the statement be made while the

declarant is under the stress or excitement generated by the event or condition. With regard to the last requirement, our high court ruled as follows:

> In State v. Smith . . . we said that "[t]he ultimate test is spontaneity and logical relation to the main event where an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication." The time interval is but one consideration in determining whether a statement was made under stress or excitement:
>
>> Other relevant circumstances include the nature and seriousness of the event or condition; the appearance, behavior, outlook, and circumstances of the declarant, including such characteristics as age and physical or mental condition; and the contents of the statement itself, which may indicate the presence or absence of stress.

Id. (citations omitted). Whether a statement qualifies as an excited utterance is left in great measure to the discretion of the trial judge. State v. Payton, 782 S.W.2d 490, 494 (Tenn. 1989).

In our view, the trial court did not abuse its discretion by allowing Christina Shore to testify regarding the victim's statements about the September 11 incident. The event qualified as startling and the statements related to the event. Although a period of several hours elapsed between the incident and the report, Ms. Shore's testimony that the victim was crying and shaking suggests that she was still under the stress generated by the incident. Almost immediately after being dropped off by Ms. Vasquez at the Shore residence, the victim offered the comments. Time is but one consideration in the determination of whether a statement qualifies as an excited utterance. Here, the statements at issue were made soon after the victim was removed from the environment in which the abuse occurred almost immediately after she was left alone with a confidante outside the family. Thus, the remarks embodied an element of spontaneity.

The defendant also complains on hearsay grounds that Elizabeth Vasquez should not have been allowed to testify that the victim asked to sleep with her on the night of September 11. Because, however, the defendant did not object to admission of the testimony at trial, the issue is waived. See Tenn. R. App. P. 36(a). Even if error, the admission into proof of the victim's request to sleep with her grandmother would have qualified as harmless error. It is our view that in the context of the entire trial, the testimony did not affect the results.

Accordingly, the judgments are affirmed.

_____
GARY R. WADE, PRESIDING JUDGE