IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 18, 2018

### STATE OF TENNESSEE v. MICHAEL FREEMAN

**Appeal from the Criminal Court for Knox County**
**No. 103488    Steven W. Sword, Judge**

_____

### No. E2018-00778-CCA-R3-CD

_____

The Defendant, Michael Freeman, appeals his second degree murder conviction, alleging that (1) the trial court improperly denied his motion to suppress his police statement because he made an unequivocal request for a lawyer; (2) that the evidence was insufficient to support his conviction; and (3) that the trial court erred by issuing a flight instruction to the jury.[1]  Following our review of the record and the applicable authorities, we conclude that the Defendant's issues do not entitle him to relief.  Accordingly, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Susan E. Shipley, Knoxville, Tennessee, for the Appellant, Michael Freeman.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Leslie Nassios and Hector Sanchez, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

On April 15, 2014, a Knox County grand jury charged the Defendant with first degree felony murder.  See Tenn. Code Ann. § 39-13-202.  Prior to trial, the Defendant

---

[1] For the sake of clarity, we have reordered the issues from how they are presented in the Defendant's brief.

filed a motion to suppress his recorded statement given at the police department. In it, he argued that he "explicitly invoked his rights to the assistance of counsel to three separate law enforcement officers" and that these requests were not "scrupulously" honored. A hearing was held on the motion. The trial court thereafter entered a written order denying the motion, concluding that the Defendant "never made an unequivocal invocation of his rights" and that he "made a voluntary and knowing waiver of all of his Miranda rights."[2] In its order, the trial court examined, in detail, each instance when the Defendant made any reference to an attorney. After the denial of his motion to suppress, the Defendant proceeded to a jury trial, where the following evidence was presented.

Around 1:00 a.m. on January 22, 2014, the Defendant called 911 to report "a crime" and requested that he be picked up by an officer. Initially, the Defendant would not provide any more details. The Defendant eventually told the operator that he stabbed a friend who was attacking him, that it was "self-defense," that he did not know if the other person was alive or not, and that he left the scene because he was afraid the person would get a gun and retaliate. The Defendant provided his name, his general description, and his location, and he advised that he would be waiting for an officer to arrive to take him to the victim's location.

Knoxville Police Department ("KPD") Officer James Lockmiller testified that he arrived at the Defendant's residence on South Dewey Road. The officers knocked on the front door, and the Defendant "started to come outside." According to Officer Lockmiller, the Defendant came out of the residence with an object in his hand. The Defendant was ordered to drop the object, and he complied. The object was a pocketknife that was wrapped in a toboggan, and the victim's blood was found on the knife. Officer Lockmiller testified that the Defendant appeared to "have an injury"; the Defendant had a cut on his hand that required bandaging.

The Defendant "said that he was involved in a stabbing incident because he had been attacked." The Defendant was unsure of the victim's address but agreed to show them the location. The Defendant was placed in a police cruiser and provided "turn-by-turn" directions to the victim's residence, which was "[r]oughly three blocks" away.

KPD Officer John Martin testified that, when he entered the victim's residence, he first observed "the victim lying on the floor just inside the doorway." Also, Officer Martin observed a large amount of blood "directly around the victim" and noted that "[i]t appeared to have dried" already in some places. Officer Martin performed a "protective sweep" of the victim's residence, opining that "it was a very well kept residence." According to Officer Martin, he did not "see any sort of disorder or a sign of a struggle

---

[2] See Miranda v. Arizona, 384 U.S. 436 (1966).

anywhere else" inside the home. There were also four vehicles parked outside, and car keys were found near the victim.

The Defendant was transported to the KPD. While waiting to speak with the lead investigator, Amy Jinks, the Defendant explained to Investigator Brian Moran that, before he stabbed the victim with the victim's pocketknife, the victim had struck him in the mouth and kept threatening to kill him. The Defendant showed Investigator Moran his lip. The Defendant claimed that the victim had "flipped" and that he acted in self-defense. When Investigator Jinks arrived at the police station, she spoke with the Defendant after giving him Miranda warnings. The Defendant told Investigator Jinks that he had known the Defendant for about three or four years and that they spent time together often. The Defendant relayed that the victim would sometimes drink too much and become insulting.

The Defendant told Investigator Jinks that he had visited the victim three times that day and that, earlier in the day, they drank vodka and watched television together. The Defendant claimed that he had asked the victim to hold $600 in cash for him. According to the Defendant, when he returned later in the evening, the victim was still drunk and began threatening him. In addition, the Defendant said that he knew the victim had a gun and brass knuckles inside the house. The Defendant claimed that the victim punched him in the mouth, so he picked up a "little bitty" pocketknife that was on the table in the den. The Defendant ultimately admitted that he stabbed the victim and took cash from the victim's pocket. He acknowledged that the victim did not have any weapons on his person at the time of the stabbing. The Defendant described that "he shoved [the victim] down and he stabbed him in the back of the neck, and he held him until he quit moving." The Defendant said that he left the residence with the knife wrapped in a toboggan and drove a few blocks to his residence before calling the police.

KPD crime scene technician Stephanie Housewright testified that she examined the victim's residence immediately following the victim's death. While she did not observe any brass knuckles inside the victim's home, she admitted that she did not look underneath the recliner. Ms. Housewright testified that she found an empty liquor bottle and a change purse containing several crack cocaine rocks next to the victim's recliner in the den. Ms. Housewright also noted that she saw boxed home security systems and some tire rims inside the home. She photographed the residence, agreeing that an object shown to her in one of the photographs of an upstairs bedroom "[p]otentially" looked like a firearm.

In addition, after the Defendant arrived at the police station, Ms. Housewright photographed "clean, crisp 20-dollar bills" that were taken off the Defendant's person. The Defendant was also photographed, and those photos were shown to the jury. The victim's blood was also discovered on the Defendant's clothing.

The victim's cellphone was examined. It was determined that an incoming call was made and answered at 11:12 p.m. on January 21, 2014.

Dr. Darinka Mileusnic-Polchan, the Chief Medical Examiner for Knox County, performed the autopsy of the victim, determining that the cause of death was "multiple stab wounds," five at least, and that the manner of death was homicide. The first wound she documented was a "complex stab wound on the chin" that went through the lower lip and "into the oral cavity or inside the mouth." She opined that it was possible that this was two separate stab wounds due to the complexity of the wound, but she could not say for certain. The second wound was on the right lower neck, where the knife penetrated the victim's thyroid gland. The third wound was a superficial cut. The fourth wound entered the left side of the neck, went through the victim's thyroid gland, penetrated his larynx, and cut his main carotid artery. According to Dr. Mileusnic-Polchan, the victim "would bleed quite profusely" from this wound, which she categorized as a "deadly wound." The fifth wound was a stab wound to the "nuchal region" at the back of the victim's head, where the blade went between the first and second vertebrae and penetrated the victim's cervical spinal cord, which "would cause partial paralysis of the extremities." Dr. Mileusnic-Polchan observed that this stab wound was downward, whereas the other four to the victim's front side were inflicted in an upward manner.

The victim's blood alcohol level was determined to be .32 percent at the time of his death. Moreover, the victim tested positive for cocaine metabolites, Valium, and a "veterinary drug . . . used to deworm cows." Dr. Mileusnic-Polchan believed that the victim had used "cocaine sometime within a couple hours of death[.]"

Dr. Mileusnic-Polchan reviewed the photographs of the crime scene and the information provided by one of her field investigators. Her investigator described the victim's body "as being still warm and flaccid[,] meaning that rigidity [had] not set in and that lividity was not prominent yet." Dr. Mileusnic-Polchan was able to observe from her review of the photographs that "the blood was drying . . . on the exposed surfaces that were not under the body," that "it was already dry on the . . . coffee table[,]" and that "it had penetrated and . . . diffused through the carpet." She maintained that, "on [the victim's] clothing items, the blood was starting actually to separate into kind of [a] serum in the blood clot" and that it had "already diffused all over the rest of the shirt and then remained in that position even the next day[.]" She stated that, "obviously, some time ha[d] to pass for all of those processes to take place." Moreover, she opined that "several hours" had passed between the victim's death and when his body was discovered and photographed, but she could not provide a precise determination of the time of death.

Dr. Mileusnic-Polchan assented that the victim's wounds were consistent with his being involved "in a struggle[.]" She could not determine, "to a reasonable degree of medical certainty[,]" the sequence in which the victim's wounds were inflicted. Dr.

-4-

Mileusnic-Polchan was able to opine that the victim was "low down on the floor" when he was stabbed in the neck. She further stated the nature of the victim's wound to the back of the head was consistent with the Defendant's being behind the victim or "above him if he's already down" and stabbing him. Moreover, the "jagged nature of some [the victim's] wounds in the facial and neck area" were also "consistent with . . . movement[.]"

The victim's daughter, Cashauna Lattimore, testified that her father lived alone, received monthly social security disability, and participated in "the numbers" or "illegal number bracket." According to Ms. Lattimore, her father frequently carried cash on his person and hid cash "throughout the residence[.]" Ms. Lattimore confirmed that her father was a daily drinker, but she claimed that "[h]e was always able to function . . . [e]xcept for when he drank something that was not his regular brand of vodka." She additionally acknowledged that her father had used cocaine in the past. Ms. Lattimore had no knowledge of her father's possessing any guns or brass knuckles immediately before his death, but he did have "several pocketknives on the side table in his den." According to Ms. Lattimore, her father no longer carried a gun because "he had gotten in trouble . . . with a weapons charge several years" prior, so "he got rid of that gun[.]" She claimed that she had not seen him with a gun since 2014.

Ms. Lattimore testified that she had known the Defendant for "maybe two or three" years prior to her father's death, that she was aware the Defendant and her father were friends, and that she had would often see the Defendant at her father's house when "their friendship was strong." However, at some point, the Defendant's and her father's friendship had "weakened" due to a disagreement, and the Defendant did not visit. According to Ms. Lattimore, the Defendant had begun "coming back" around to her father's house "closer in time to [her] father's death[.]"

Ms. Lattimore stated that she visited her father's home the day after his death. While there, she did not find the cash her father kept inside a pillowcase or any brass knuckles. Ms. Lattimore reported that a burglary occurred at the residence several days later. Ms. Lattimore also admitted that there were several females who were "out stealing things and bringing [them to her father] for him to fence." She was aware that this happened "on a regular basis[.]"

The victim's cousin, Avery Maurice Jack, testified that the victim "played the numbers every day[.]" Mr. Jack identified two calendars on the wall above the victim's desk that showed several sequences of numbers on specific days. The last entry was January 21, 2014. Mr. Jack also testified that the victim kept cash hidden around his house and that the victim did not have a gun or brass knuckles.

-5-

Michael Shadden, another cousin of the victim's, also testified. Mr. Shadden identified the rims in the victim's home and testified that he sold those to the victim "because they wouldn't fit on [his] car." Mr. Shadden further stated that the victim "never carried a gun" and that he had never seen brass knuckles in the house.

Tessa Freeman, the Defendant's sister, testified that she saw the Defendant in the driveway of the home they shared that evening between 10:00 and 10:30 p.m. However, when she left again around 11:30 or 11:45 p.m., the Defendant was gone. According to Ms. Freeman, he was still not home when she returned about thirty minutes later.

Angela McAfee was one of the women who routinely supplied the victim with stolen goods. Ms. McAfee spoke with the victim in the "daytime" on January 21, 2014, the day of his death, because she "needed money." After this conversation, she and a friend, Savanna Holloway, went to steal some candy, toboggans, and batteries. According to Ms. McAfee, when they arrived at the victim's house, it was during the day, and they had a conversation with him in the dining room. The Defendant was present. Ms. McAfee said that the victim offered the Defendant some of the stolen items, but he refused them. Ms. McAfee testified that, during this conversation, the Defendant "pulled out a little bitty . . . pocketknife and stood by" the victim. The victim instructed the Defendant to put the knife away. Ms. McAfee stated that everyone was being "friendly" and laughing.

Ms. Holloway also testified. She recalled that this visit to the victim's house occurred around 10:00 or 11:00 p.m. Ms. Holloway testified that, during this conversation, the Defendant was "very agitated" and "was pacing back and forth" with a "knife in his hand[.]" While the Defendant made Ms. Holloway "nervous," he was not threatening anyone.

The Defendant called Kelly Johnson, records custodian and fraud specialist at ORNL Federal Credit Union, who provided information on a checking account belonging to the Defendant's wife, Heather Lange. According to Ms. Johnson, on January 21, 2014, there was an ATM withdrawal of $600 at 2:29 p.m. from the account, and an additional withdrawal from another ATM at 4:29 p.m. in the amount of $163.

The Defendant's wife then testified. Ms. Lange stated that only she and her husband had access to the debit card and PIN number for her account. She denied that she made any withdrawals from the account on January 21, 2014, claiming that she "was home all day." She did not recall why her husband made these withdrawals that day. However, she did recall the Defendant's returning home that evening "terrified," holding a knife in his hand, and saying that the victim "was gonna kill" him.

-6-

Following the conclusion of the proof, the jury found the Defendant guilty of the lesser-included offense of second degree murder. See Tenn. Code Ann. § 39-13-210. The trial court sentenced the Defendant to twenty-one years' imprisonment. The Defendant timely appealed.

ANALYSIS

On appeal, the Defendant argues (1) that he made an unequivocal request for counsel during his interrogation and that the trial court therefore erred in denying his motion to suppress the statements he made to police following his invocation; (2) that the evidence was insufficient to support his jury conviction; and (3) that the issuance of a flight instruction to the jury was error. We will address each of the Defendant's issues in turn.

I. *Motion to Suppress*

The Defendant argues that the trial court erred by denying his motion to suppress his statements made to police after he unequivocally invoked his right to counsel. Specifically, the Defendant asserts that "[t]he video recording of [his] interactions at the [KPD] clearly establish that he was explicitly asking for an attorney before either of the investigators came into the interrogation room." According to the Defendant, "[s]ome of [his] requests were equivocal ("I feel like I might need a lawyer,") but, others were emphatic: "I'm going to call a lawyer," "Just tell them to bring a lawyer up here," and "I am going to call a lawyer." He surmises that his "unequivocal requests for the assistance of counsel were not scrupulously honored[.]" The State responds that the trial court correctly allowed the Defendant's confession to be admitted into evidence because he "never made an unequivocal and unambiguous request for counsel." The State continues, "even if this [c]ourt were to find that such a request had been made, the [D]efendant would not be entitled to relief because he immediately reinitiated conversation with officers and because he subsequently made a knowing and voluntary waiver of his rights."

A. *Suppression Hearing*

The video recording of the Defendant's interrogation at the police station was entered into evidence at trial. After arriving at the police station, the Defendant was taken to an interview room. The lead investigator, Amy Jinks, was at the crime scene, so the Defendant had to wait in the interview room alone for some time. During this time, he spoke with Investigator Brian Moran and other unnamed officers. Investigator Moran explained to the Defendant that the investigator handling the case would be there shortly to speak to him about what happened. Investigator Moran made it clear that he was not the investigator on the case and that someone else would speak to the Defendant about it.

He further stated that they could not ask him any questions about what happened until they had gone over his rights with him. The Defendant continued to make statements about what happened. The Defendant did make multiple references to an attorney throughout his interactions with the police that night. The Defendant's sister, Tessa Freeman, was also apparently sitting near the interrogation room.

When Investigator Jinks finally arrived and entered the interview room, the Defendant immediately began to explain what happened. Investigator Jinks stopped him and said she first needed to explain his rights to him. She then went over his Miranda rights, and the Defendant executed a written waiver. The Defendant said, "I understand my rights. I don't have anything to hide. . . . It was self-defense." The Defendant also stated that he wanted to speak with the police but that he did not want to be "railroad[ed]." The first question by Investigator Jinks occurred at 3:01 a.m.

The Defendant testified that, on January 21, 2014, he was on several prescription medications for "real bad anxiety, some kind of a PTSD, and . . . mood disorder." He admitted that he was also drinking vodka on January 21, 2014. The Defendant said that he told the police he wanted a lawyer as soon as they encountered him the first time at the front door of his residence. He also said that he wanted to speak with the police, but with an attorney present; that was why he called 911 in the first place. According to the Defendant, the officers continually ignored his requests for a lawyer. The Defendant frequently asked when and if he would be released from custody. When asked if he mentioned an attorney because he was "just kind of tired of waiting" for Investigator Jinks, he said, "No. It was more than that. . . . Like I said, I had a lot of issues going on at one time."

## B. *Relevant Law*

The United States and Tennessee Constitutions protect a suspect from "being compelled to give evidence against himself." State v. Berry, 141 S.W.3d 549, 576 (Tenn. 2004) (citing U.S. Const. amend. V; Tenn. Const. art. I, § 9); see also State v. Turner, 305 S.W.3d 508, 515 (Tenn. 2010). When a defendant is in custody and subject to interrogation, the police must first inform him of his Fifth Amendment rights in order for his confession to be admissible as substantive evidence in the trial of the matter. See Miranda v. Arizona, 384 U.S. 436 (1966). Pursuant to Miranda, law enforcement officers are required to warn a person prior to custodial interrogation that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that, if he cannot afford an attorney, then one will be appointed for him prior to any questioning if he so desires. Id. at 479. A defendant may waive his rights under Miranda if such waiver is voluntary, knowing, and intelligent. State v. Echols, 382 S.W.3d 266, 280 (Tenn. 2012). The State bears the burden of proving by a preponderance of the evidence that the defendant waived his

Miranda rights. State v. Climer, 400 S.W.3d 537, 564 (Tenn. 2013) (quoting Berghuis v. Thompkins, 560 U.S. 370, 384 (2010)).

Furthermore, the United States Supreme Court generally stated in Miranda that the right to counsel is invoked when an individual "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking[.]" 384 U.S. at 444-45. However, eight years later in Davis v. United States, the United States Supreme Court adopted a significantly narrower standard for invoking a right to counsel under the Fifth Amendment when it held that "[i]nvocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" 512 U.S. 452, 458-59 (1994) (quoting McNeil v. Wisconsin, 501 U.S. 171, 178 (1991)). "[G]eneric and equivocal statements made by a person who is still in the decision making process" do not invoke the right to counsel. State v. Saylor, 117 S.W.3d 239, 246 (Tenn. 2003) "When a suspect invokes the right to counsel, police must cease questioning until counsel is present" or the suspect initiates further conversation with the police. Id. (citing Miranda, 384 U.S. at 444-45; Edwards v. Arizona, 451 U.S. 477 (1981); State v. Stephenson, 878 S.W.2d 530, 548 (Tenn. 1994)). Once the suspect invokes his right to counsel, any later statement made by a defendant as a consequence of interrogation by police must be suppressed. Edwards, 451 U.S. at 487. The issue of whether a suspect's request for an attorney was unequivocal is a mixed question of law and fact that is subject to de novo review. Climer, 400 S.W.3d 537, 556 (Tenn. 2013) (citing Turner, 305 S.W.3d 508, 514-15 (Tenn. 2010)).

In Davis, the Supreme Court stated that, although it is a good policy for law enforcement to clarify whether a suspect has actually asked for an attorney when the suspect's request is ambiguous, it "decline[d] to adopt a rule requiring officers to ask clarifying questions." 512 U.S. at 461. The Court explained, "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." Id. at 461-62. Accord Saylor, 117 S.W.3d at 246 ("The standard for a valid invocation of the right to counsel is the same under both [a]rticle I, [s]ection 9 [of the Tennessee Constitution] and the Fifth Amendment.").

C. *Standard of Review and the Trial Court's Ruling*

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008) (citing

State v. Scarborough, 201 S.W.3d 607, 615 (Tenn. 2006)). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. (citing State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007)). Conversely, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Id. (citing State v. Hayes, 188 S.W.3d 505, 510 (Tenn. 2006)). In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

In its order denying the Defendant's motion to suppress, the trial court made extensive findings of fact and conclusions of law reviewing each statement made by the Defendant prior to Miranda warnings. The trial court analyzed as follows:

1. The first instance for which the court finds credible proof that the [D]efendant made any reference to an attorney occurred after he was placed in the interview room prior to the arrival of Investigator Jinks. He caught the attention of an officer and said, "If they gonna charge, I'm just gonna call . . . I just going to call me a layer and just tell him what . . ." The officer interrupted and said the investigator was coming right now. The defendant replied, "Well still, might just call me a lawyer because . . ." Again, the officer said, "you talk to him about that," and then addressed another officer about the [D]efendant talking about an attorney.

The court does not find this to be an unequivocal request for counsel in the context of this case. It is important to note that the [D]efendant is the one who called the police to report the incident. He showed no reluctance at the beginning to speak with the police about what happened. To the contrary, it appears that is exactly what he wanted to do. After this initial statement to the officer, Investigator Moran stepped in to ask the [D]efendant what was going on. It was clear that Investigator Moran had more authority than the first officer. When Moran asked him, "What's going on buddy?" The [D]efendant did not mention anything about an attorney. Instead, he said, "Just tell me what y'all need from me and I . . . how long I gotta be before I can bond out of jail." Moran made it clear that they didn't know what had happened yet. The [D]efendant then said, "I know it's going to be a minute but I'm gonna tell you exactly what happened." This is completely contradictory to any claim that he wanted to speak to an attorney before telling the police what happened.

2. A few minutes later, the [D]efendant again got the attention of another officer and stated, "I'm gonna need to call a lawyer, man." The

court finds that this was a statement not designed to invoke his right to counsel, but was rather an expression of his desire that the process move along faster. As reflected below in his subsequent statements, the [D]efendant was using the threat of calling a lawyer to prod the investigators into speaking to him and moving the investigation along. The court does not find this to be an unequivocal request for counsel in the totality of the circumstances. The officer did not ask the [D]efendant any questions. Instead he said the investigator would be back in just a minute. It is clear from the context that this officer was telling the [D]efendant that the issue of counsel would need to be addressed with one of the investigators.

3. The [D]efendant then addressed his sister who was outside the interview room and said, "And I call me a lawyer . . . I might go ahead and call me a lawyer." This clearly was not directed toward the police, but further evinced his equivocation on whether he "might" call a lawyer. It shows that he was still in the decision making process of what he should do.

4. The [D]efendant then addressed another officer by saying, "I didn't want to get a lawyer involved . . ." Again, this is not an unequivocal request for an attorney, but showed that the [D]efendant was conflicted on whether or not to call a lawyer. In fact, this statement reveals the defendant's desire not to call an attorney and to "tell what happened." He was expressing frustration at how long he was having to wait to tell his story.

5. The officer then tried to explain to the [D]efendant why it was taking so long and the [D]efendant stated, "I called y'all, you know what I'm saying?" The court takes this to mean that the [D]efendant wanted to speak with the police from the beginning. He then said, "I mean I called y'all but it seems like I'm going to have to call me a lawyer . . . anyway." Once again, the court finds that this is not an unequivocal request for an attorney, but rather an expression that he might change his mind and call an attorney instead of speaking to the police. The officer told the [D]efendant that that was something he would need to address with the investigator.

6. The [D]efendant then told the officer that he "wanted to get this over with . . . and call me a lawyer cause I called y'all. . . . I'll give y'all his knife, his toboggan. Got what I had on . . ." The court does not find this to be an unequivocal request for an attorney. It appears from the context that

-11-

the [D]efendant was again expressing frustration in the delay, not a desire to speak to counsel.

7. At this point, Investigator Moran returns to the room and gets some more information regarding the [D]efendant's identity. The [D]efendant then states, "Do I need to call a lawyer before I talk to y'all?" This is not an unequivocal request for an attorney. It is yet additional evidence that the [D]efendant has not decided if he wants to speak with an attorney or follow through on his initial plan to tell the police what happened. Investigator Moran gave the appropriate response and said that it was up to him and that he would be read his rights.

8. The [D]efendant went on to reiterate that he called the police himself and that he had nothing to hide—meaning that he was willing to tell what happened. He next states, "I feel like I might need a lawyer." Once again, this is not an unequivocal request for an attorney. The [D]efendant is further revealing the inner struggle he is having over whether or not he should call a lawyer or speak to the police. Moran told him that he would have an opportunity to tell his side of the story "if you choose to talk to us." He made it clear to the defendant that he would have the option not to speak to the investigator.

9. The [D]efendant went on to spontaneously tell the officer what happened and that he acted in self-defense. He then stated, "Do I need to get a lawyer or what?" As before, this is not an unequivocal request for counsel. Moran told him again that was a decision he would need to make himself. Again, the [D]efendant made statements about what happened without Investigator Moran asking any questions. The [D]efendant is demonstrating a continued decision making process on whether or not to speak with the police.

10. After waiting a while longer, the [D]efendant left the interview room again. He can be heard saying on the way back into the room, "I gotta talk to a lawyer." This is the closest the [D]efendant comes to requesting to speak to counsel. However, based on the totality of the circumstances, the court does not find this to be an unequivocal request for counsel. The [D]efendant had been expressing a desire to tell what happened to the police all night from the point he first called 911. He was clearly frustrated in how long it was taking for someone from the police to talk to him about what happened and that his sister was at the police station. No one from the police asks the [D]efendant any questions at this point. They simply tell him to wait. The next thing that happens is that the

[D]efendant, once again, reaches out to Investigator Moran and asks him to step into the room. He asks that the door be closed and says, "What do you want to hear? I mean I want to go home. I want to tell the truth. I defended myself. I called the police." He then goes on to explain what happened. This action convinces the court that the [D]efendant was not making an unequivocal request for counsel in this latest statement. It appears he was using the threat of speaking to an attorney as a means of getting the police to go ahead and talk to him about what happened instead of having to wait any longer. At the end of his story, Investigator Moran again tells him several times that he can't ask him any questions about what happened until he was advised of his rights. The [D]efendant went on to make unsolicited statements about what occurred.

11. When Investigator Jinks arrives, she enters the room with the [D]efendant. The [D]efendant immediately begins to tell Investigator Jinks what happened before she has a chance to talk to him about his rights. After stating what he did, the [D]efendant then said, "I know I could talk to a lawyer and probably get out tonight." This statement shows that the [D]efendant has known all along that he could speak to an attorney and end his interactions with the investigators at any point in the evening. The fact that he didn't shows he never actually wanted to speak to an attorney and is further support of the court's findings that he failed to make an unequivocal request for counsel.

The trial court detailed that, at this point, "Investigator Jinks read the [D]efendant his <u>Miranda</u> rights, including his right to counsel. The [D]efendant acknowledged that he understood those rights and was willing to make a statement. He again affirmed his desire to tell the officer what happened. The interview began." The trial court determined that the Defendant "made a voluntary and knowing waiver of all of his <u>Miranda</u> rights."

The trial court additionally noted that, "[t]oward the end of this interview, the [D]efendant reiterated, 'I know I coulda had a lawyer here and blah, blah, this and blah, blah that.'" According to the trial court, this statement "further show[ed] that the [D]efendant clearly understood that he could consult with an attorney without answering any questions from the police and that he had no intention of invoking his right to counsel." Finally, the trial court observed that,

[a]fter Investigator Jinks left the interview room, the [D]efendant summoned another officer into the room. He said he wanted someone to talk to. He again spontaneously stated that he stabbed the victim in self-defense. A short time later, Investigator Moran re-enters the room as they

are preparing to transport the [D]efendant to the jail. Once again, the [D]efendant gives an unsolicited account of defending himself.

## D. *Application*

The trial did not find the Defendant credible when he testified at the suppression hearing that he told the police he wanted an attorney during the initial encounter or that he wanted an attorney present during questioning. Moreover, from our examination of the record and our own review of the video recording, we agree with the trial court that the Defendant's statements did not rise to the level of an unequivocal invocation of the Defendant's right to counsel. The Defendant's statements indicate that he was still in the decision making process; they do not clearly request counsel. See Saylor, 117 S.W.3d at 246. They merely indicate that he was seeking to expedite the process in order to get released sooner. Indeed, this situation is similar to others in which our courts have found the accused did not unequivocally and unambiguously invoke his right to counsel.

The trial court set forth the relevant caselaw and provided pertinent examples in support of its conclusion. The trial court determined that the Defendant did not unequivocally invoke his right to counsel, concluding that the Defendant's "multiple references to an attorney to be akin to statements that have previously been found to be equivocal statements regarding the right to counsel and not an actual request." The trial court cited to the following cases in support of its conclusion: Davis, 512 U.S. at 462 ("Maybe I should talk to a lawyer"); Turner, 305 S.W.3d at 508, 511, 520 ("Um, how quick will my lawyer get here?"); Saylor, 117 S.W.3d at 243-44 ("Well . . . I guess it don't matter until I can get a lawyer present."; "I'm supposed to have a lawyer though, don't I?"; "I have to have a lawyer present, I reckon. Before you ask me. That's the story, isn't it?"; "You have to have a lawyer present before questioning."; and "I might need a lawyer because somebody might try to accuse me of something I didn't do."); State v. Mitchell, 137 S.W.3d 630, 636-37 (Tenn. Crim. App. 2003) ("Do you think I need a lawyer?"); State v. Michael James Bell, No. E2008-01499-CCA-R3-CD, 2010 WL 3612751, at *24 (Tenn. Crim. App. Sept. 17, 2010) ("I think I need to talk to a lawyer."); State v. Adam Sanders, No. M2005-02185-CCA-R3-CD, 2006 WL 3516210, at *8 (Tenn. Crim. App. Dec. 6, 2006) ("I guess I need a lawyer, don't I?"); State v. James Robert Ledford, No. E1999-00917-CCA-R3-CD, 2000 WL 1211312, at *9 (Tenn. Crim. App. Aug. 28, 2000) ("Don't I need to talk to a lawyer?"); State v. James Clayton Young, Jr., No. 01C01-9605-CC-00208, 1998 WL 258466, at *12 (Tenn. Crim. App. May 22, 1998) ("I'm sorry, I'm just wondering if I should have a lawyer."); State v. John M. Ake, No. 01C01-9603-CC-00094, 1997 WL 311908, at *2 (Tenn. Crim. App. June 6, 1997) ("I probably need to get a lawyer, don't I?")). See also State v. Lavonte Dominique Simmon, No. E2016-01582-CCA-R3-CD, 2018 WL 1381786, at *25 (Tenn. Crim. App. Mar. 19, 2018) (agreeing "with the trial court that the [d]efendant's inquiry—

-14-

"Do you know when is that? . . . You know when is that? . . . When the lawyer can come?"—was not an unequivocal invocation of the [d]efendant's right to counsel), perm. app. denied (Tenn. July 19, 2018). The evidence does not preponderate against the trial court's findings of fact in this regard, and its ultimate legal conclusions were well-founded.

In addition to the cases correctly cited by the trial court, we note that the Defendant's statements contrast with those previously deemed sufficiently clear to invoke the right to counsel. See, e.g., Turner, 305 S.W.3d at 522 (holding that the defendant's later statement, "Get me a lawyer," was an unequivocal invocation of his right to counsel); State v. Koffman, 207 S.W.3d 309, 318 (Tenn. Crim. App. 2006) (concluding that the "[d]efendant's request to call [a judge and a federal defender who previously represented defendant] prior to the initiation of questioning was an unequivocal request for the assistance of counsel"); State v. Michael Lee McCormick, No. E2003-02689-CCA-R9-DD, 2004 WL 2583903, at * 11 (Tenn. Crim. App. Nov. 15, 2004) (finding the statements, "I'd be willing to [cooperate], I'd like to have a lawyer at this point," and, "I'll do anything, but I still think I, you know, like to have a lawyer with me, and I'll be glad to [cooperate]," to be clearly and unambiguously requesting counsel); State v. Tidwell, 775 S.W.2d 379, 387 (Tenn. Crim. App. 1989) (determining that the statement, "I'd like to call a lawyer before I discuss that," to be an unequivocal invocation). Acordingly, we conclude that the trial court did not err by denying the Defendant's motion to suppress.

## II. *Sufficiency of the Evidence*

The Defendant challenges the sufficiency of the convicting evidence supporting his second degree murder conviction. Specifically, the Defendant maintains that there was insufficient evidence presented to establish that he "committed an intentional killing and that his actions were reasonably certain to cause a homicide where the weapon used was a small pocketknife, and [he] sought assistance for the victim by reporting the confrontation to authorities." The Defendant further surmises that "[t]he incident . . . appears to involve a foolish, drunken argument between two friends." In addition, he notes that his actions—committing "a homicide with a small folding pocketknife that he opportunistically found at the victim's residence"; availing "himself of [a weapon] that would not be considered to have a great degree of inherent deadliness"; calling 911; leading officers to the victim's location thereby allowing them to provide aid; and asking during his interrogation "what the victim had said about the incident"—were "not consistent with [his] being aware that his conduct was reasonably certain to cause death." The State counters that the evidence was sufficient, contending that "[t]he jury could reasonably conclude that stabbing an individual five different times in the head and neck

-15-

area—and severing both the carotid artery and spinal cord—was reasonably certain to cause death."

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; see State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Second degree murder is statutorily defined as the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). Our supreme court has determined that second degree murder is a "result of conduct" offense. See State v. Brown, 311 S.W.3d 422, 431-32 (Tenn. 2010); State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). Here, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). Whether a defendant acts knowingly is a question of fact for the jury. See State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). The jury may infer a defendant's mental state from "the character of the assault, the nature of the act and from all the circumstances of the case in evidence." Id. at 105; see also Brown, 311 S.W.3d at 431.

In addition, the Defendant claimed self-defense at trial. When a defendant relies upon a theory of self-defense, the State bears the burden of proving that the defendant did not act in self-defense. State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001). Further, it is well-settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact. See State v. Goode, 956 S.W.2d 521, 527

(Tenn. Crim. App. 1997); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). "Encompassed within that determination is whether the defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault." State v. Thomas Eugene Lester, No. 03C01-9702-CR-00069, 1998 WL 334394, at *2 (Tenn. Crim. App. June 25, 1998) (citing State v. Renner, 912 S.W.2d 701, 704 (Tenn. 1995)). It is within the prerogative of the jury to reject a claim of self-defense. See Goode, 956 S.W.2d at 527. Upon our review of a jury's rejection of a claim of self-defense, "in order to prevail, the defendant must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994).

In the light most favorable to the State, the evidence established that the victim suffered at least five stab wounds to his face, neck, and the back of the head. The victim's carotid artery and spinal cord were severed. Both women who were present in the victim's house while the Defendant was there testified that they saw the Defendant wielding a knife. According to the medical examiner, the evidence was consistent with the Defendant's being behind the victim and stabbing him in the back of the head. At the time the victim was stabbed in the neck, he was "low down on the floor." The Defendant admitted to stabbing the victim, even referring to the knife during his interrogation as the murder weapon. The knife was found in the Defendant's possession, and the Defendant admitted to drinking alcohol that day.

Moreover, the Defendant told Investigator Jinks that "he shoved [the victim] down and he stabbed him in the back of the neck, and he held him until he quit moving." The victim did not have any defensive wounds, and there was no evidence of a weapon on or near the victim at the time of the stabbing. The jury, as was its prerogative, rejected the Defendant's claim of self-defense. A reasonable juror could have rejected the Defendant's claim of self-defense and concluded the Defendant acted knowingly by being aware that stabbing the victim with a pocketknife five different times in the head and neck area was reasonably certain to cause death. See, e.g., State v. Douglas V. Killins, No. M2004-00341-CCA-R3-CD, 2005 WL 94422, at *3-5 (Tenn. Crim. App. May 2, 2005) (rejecting a sufficiency challenge under similar facts that included stabbing the victim with a pocketknife and a defense of mutual combat or self-defense). The evidence is sufficient to support the Defendant's conviction.

### III. *Flight Instruction*

The Defendant argues that the trial court erred by "allowing the jury to consider a flight instruction where the proof established that the Defendant contacted the authorities to report the incident and led them to the victim's location." According to the Defendant, "[t]here is no indication he attempted to flee, hide out[,] or otherwise evade the

-17-

authorities." He notes that he "drove the few blocks to his residence and called 911"; that he "waited until the police arrived, holding the homicide weapon in a cap"; and that he "was arrested without incident and went with the police to the scene." Furthermore, he contends that the improper instruction was prejudicial because "it led jurors to believe he should be held responsible merely because he was not present at the scene of the argument at the time of his arrest." The State replies that "the trial court correctly included a jury instruction on flight because the Defendant both left the scene and subsequently evaded police for some time." Moreover, assuming error, the States asserts that "the flight instruction . . . had a minimal impact on the jury's decision," and any error should be considered harmless.

A defendant in a criminal case "has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); see State v. Leath, 461 S.W.3d 73, 105 (Tenn. Crim. App. 2013). When reviewing jury instructions on appeal to determine whether they are erroneous, this court must "review the charge in its entirety and read it as a whole." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). A jury instruction is considered "prejudicially erroneous," only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." Id. Because the propriety of jury instructions is a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. Carpenter v. State, 126 S.W.3d 879, 892 (Tenn. 2004).

The trial court can only charge the jury on flight if there is sufficient evidence to support the instruction. Berry, 141 S.W.3d at 588. There is sufficient evidence to support a jury charge on flight when there is proof the defendant left the scene of the crime and of a "subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown." State v. Burns, 979 S.W.2d 276, 289-90 (Tenn. 1998) (quoting State v. Payton, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989). The subsequent hiding out, evasion, or concealment requirement can be satisfied by evidence from which a jury might infer that a defendant committed this act. See State v. Joshua Hill-Williams, No. W2015-01743-CCA-R3-CD, 2017 WL 1907735, at *12 (Tenn. Crim. App. May 9, 2017); State v. Terrance Wilks, No. W1999-00279-CCA-R3-CD, 1999 WL 1097832, at *4 (Tenn. Crim. App. Nov. 22, 1999). "Any contradictory evidence that serves to rebut the [S]tate's proof merely raises a question for the jury to resolve." Payton, 782 S.W.2d at 498. The defendant may rebut evidence of flight by a "credible explanation of some motive other than guilt." Hall v. State, 584 S.W.2d 819, 821 (Tenn. Crim. App. 1979).

In the present case, the State requested that the court include an instruction on flight. The Defendant objected, arguing that there was insufficient evidence to support such an instruction and noting that he was "the one who called 911." After consideration,

the court included the instruction, stating that "there [was] sufficient proof to fairly raise the issue" because the Defendant "clearly left the scene of the accident" and because there was "a question about how quickly he called [911], so . . . that could be the subsequent evading." The trial court thereafter instructed the jury as follows:

> The flight of a person accused of a crime is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the [D]efendant fled is a question for your determination.

> The law makes no precise distinction as to the manner or method of flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving the community for parts unknown, to constitute flight.

> If flight is proved, the fact of flight alone does not allow you to find that the [D]efendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all the other evidence when you decide the guilt or innocence of the [D]efendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case.

> Whether there was flight by the [D]efendant, the reasons for it, and the weight to be given to it, are questions for you to determine.

See Tenn. Prac. Pattern Jury Instr. T.P.I.--Crim. 42.18 (16th ed.).

Even a brief evasion of authorities can support the giving of the flight instruction. Payton, 782 S.W.2d at 498. Moreover, our supreme court has held that "[a] flight instruction is not prohibited when there are multiple motives for flight" and that "[a] defendant's specific intent for fleeing a scene is a jury question." Berry, 141 S.W.3d at 589. Here, the State presented evidence, albeit circumstantial, that the Defendant fled the scene, went home, and remained concealed there for one to two hours before calling 911. The Defendant acknowledged that he left the scene and "drove the few blocks to his residence." According to the Defendant, he had shoved the victim to the floor and stabbed him in the back of the neck, and the victim was no longer moving when he left the residence. The Defendant's sister testified that she saw the Defendant in the

-19-

driveway of the home they shared home between 10:00 and 10:30 p.m., but when she left again around 11:30 or 11:45 p.m., the Defendant was gone. The victim's cellphone was examined, and it was determined that an incoming call was made and answered at 11:12 p.m. on January 21, 2014. The Defendant's wife testified that the Defendant returned home that evening "terrified," holding a knife in his hand. The Defendant did not call 911 until around 1:00 a.m., and initially, he did not provide any details other than to report "a crime."

There was testimony that the victim's blood had already started to dry when the officers arrived at the victim's residence. Dr. Mileusnic-Polchan observed that "the blood was drying . . . on the exposed surfaces that were not under the body," that "it was already dry on the . . . coffee table[,]" and that "it had penetrated and . . . diffused through the carpet." She maintained that, "on [the victim's] clothing items, the blood was starting actually to separate into kind of [a] serum in the blood clot" and that it had "already diffused all over the rest of the shirt and then remained in that position even the next day[.]" Moreover, she stated that "obviously, some time ha[d] to pass for all of those processes to take place" and opined that "several hours" had elapsed between the victim's death and when his body was discovered and photographed. Accordingly, we are constrained to agree with the trial court that there was sufficient evidence for a rational juror to infer that the Defendant sought to conceal himself in the community and, only after some deliberation, decided to alert the authorities and turn himself in to the police. See, e.g., State v. Smith, 893 S.W.2d 908, 918 (Tenn. 1994) (finding circumstantial evidence of an immediate flight because the facts led to a reasonable inference that the defendant had seen the flashing lights of a passing police car, which was responding to another call nearby, and concealed himself and left the scene); Hill-Williams, 2017 WL 1907735, at *12-13 (concluding that, although the defendant called 911 after he shot the victim, there was sufficient evidence to support a flight instruction because the defendant also left the scene of the shooting and went home, but did not stay there, and only later turned himself in to law enforcement after learning his twin brother was in custody for the shooting).

Moreover, the trial court instructed the jury that "flight alone does not allow you to find that the defendant is guilty of the crime charged" and "an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case." The Defendant was free to rebut the flight theory by offering his explanation for his departure and emphasizing that he called the authorities and ultimately led them to the victim's location. Further, given the overwhelming proof of the Defendant's guilt, any error in giving the flight instruction was harmless. See, e.g., Smith, 893 S.W.2d at 918 (concluding "any error as to the flight instruction" was harmless given the "overwhelming proof of [the defendant's] guilt"). This issue does not entitle to the Defendant to relief.

## CONCLUSION

In accordance with the foregoing, we conclude that the trial court did not err in denying the Defendant's motion to suppress, that the evidence was sufficient to support the Defendant's conviction, and that issuance of a flight instruction was proper. Because the Defendant's issues do not entitle him to relief, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE