**STATE of Tennessee, Appellee,**

v.

**Michael Anthony PAYTON, Appellant.**

Court of Criminal Appeals of Tennessee, at Nashville.

Aug. 25, 1989.

Permission to Appeal Denied by Supreme Court Nov. 13, 1989.

Jeffrey A. DeVasher and J. Paul Newman, Asst. Public Defenders, Nashville, for appellant.

Charles W. Burson, Atty. Gen. and Reporter, Linda Ann Hammond, Asst. Atty. Gen., John Zimmerman, Asst. Dist. Atty. Gen., Nashville, for State.

## OPINION

WADE, Judge.

The defendant, Michael Anthony Payton, appeals of right from convictions of armed robbery and assault with intent to commit armed robbery. He received concurrent sentences of 40 and 15 years respectively. The following issues are presented by this appeal:

(1) whether the trial court should have granted the defendant's motion for judgments of acquittal on grounds of insufficiency of the evidence;

(2) whether certain hearsay evidence should have been admitted under the excited utterance exception;

(3) whether the trial court properly allowed the state to inspect as *Jencks* material the notes of an investigator for the defense;

(4) whether there was prosecutorial misconduct during closing argument; and

(5) whether the trial court properly instructed the jury on the issue of flight.

We find no prejudicial error and affirm.

At about 2:00 A.M. on August 11, 1987, Marcie Vestal, the primary victim, returned to her Nashville duplex with her cousin, Angela Burns. As they walked from their car to their residence, the victim recognized a man approaching them as the defendant, whose brother lived next door. A street light approximately 30 feet away was the nearest source of light. The victim screamed when she saw the defendant in the possession of a handgun. Burns hurriedly unlocked the duplex unit and ran inside as the defendant first demanded, wrestled for, and then grabbed the victim's purse, which contained over $500. The victim, pregnant at the time, was pushed to the ground in the struggle and subsequently hospitalized.

The victim claimed to have seen the defendant clearly. She described him as wearing a baseball cap and something over his face. The accuracy of her description, she said, was "a nine on a ten point scale"; there was just a "one percent [chance] it couldn't have been him." The victim was unable to identify a person who was standing in the area to which the defendant fled.

Burns described the robber as having a dark complexion and wearing a child-size baseball cap and a shirt that she had previously seen both the defendant and his brother wear. A stocking worn over his face did not distort his features. She made an identification of the defendant whom she knew from prior visits to the victim's home.

When Burns returned from taking the victim to a hospital for treatment, she saw the defendant, wearing different clothes, in a nearby yard and called authorities.

When confronted by the police, the defendant denied he was Michael Payton, claimed to be "Tim Fort," and ran. Officers were able to make the arrest in a nearby yard when the defendant fell. When apprehended, the defendant said, "I didn't rob anybody, I don't even have the same clothes."

Although she had previously described the certainty of her identification as seven or eight on a scale of ten, Burns testified at trial that it was nine on a scale of ten.

An investigator with the public defender's office testified that the nearest street light to the duplex was fifty yards away. Notes of his phone conversation with Burns, which were inspected by the state, indicated the victims knew the defendant as "Mike–Mike," a nickname Burns gave to police on the morning of the robbery. His notes also indicated that the defendant was described as wearing a red baseball cap.

Tyrone Johnson, who lived 30 feet away from the victim, Vestal, testified that on the morning of the robbery, he was awakened by a scream, saw a man and woman struggle over a pocketbook, and observed the man pull a gun then run

across the street. Johnson said the defendant, who wore green jail clothing on the morning of the offense, was not the robber. The witness, however, never reported his observations to authorities. At the time of the trial, Johnson was in jail for possession of a controlled substance. Previously convicted of armed robbery, grand larceny, and fraudulent use of a credit card, Johnson offered to testify for the defendant when they were both in jail. He described himself as a friend of the defendant's brother, Larry.

Larry Payton, who had been previously convicted of conspiracy to commit burglary and two felony offenses related to his receipt of stolen property, stated that the defendant wore green khakis, a green shirt, and flip flops at about 5:30 A.M. when first confronted by police on the morning of the offense. He denied that he had loaned the defendant any of his clothing earlier in the evening. Payton acknowledged that the defendant ran when confronted by police.

The defendant, who was released from jail on a separate charge on the afternoon of August 10, claimed he was asleep at his mother's home, about six blocks away from the scene of the robbery, at 2:00 A.M. on August 11th. He said he wore a green shirt, green khaki pants and flip flops issued to him while in jail. He denied having borrowed clothes from his brother earlier in the morning but admitted that he was at his brother's duplex at 5:30 on the morning of the offense. He denied any involvement in the Vestal robbery or the attempt to rob Burns.

Martha Hills, the defendant's mother, confirmed that the defendant was asleep at her home at the time of the robbery although she could not recall whether she was sleeping at 1:00 A.M.

## I

The defendant contends that the weakness of the identification testimony coupled with the defendant's proof of alibi renders the evidence insufficient to support the verdict.

On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 836 (Tenn.1978). The verdict of guilt removes the presumption of innocence and gives rise to a presumption of guilt. *State v. Grace*, 493 S.W.2d 474, 476 (Tenn.1973). This court, in reviewing the evidence in the light most favorable to the state, must conclude that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Rule 13(e), Tenn.R.App.P.

Although much is made over the fact that the defendant was in jail one week before the offenses, a time when each of the victims claimed they had seen the victim in their neighborhood, that is really a collateral issue. The evidence was certainly favorable to the defendant, was an appropriate concern for the jury, but does not establish, if deemed inaccurate, an absolute defense. The significant question is whether there was sufficient evidence of the identification at the time of the robbery.

Because our review entitles the state to the strongest legitimate view of the evidence and all reasonable inferences, we must hold that the post-verdict motion for a judgment of acquittal was properly denied. While conceding that there was a one percent chance of misidentification, the victim Vestal concluded, "I know it was [him]." Burns said that there was no doubt in her mind that her identification of the defendant as the robber was correct. Each knew the defendant and had seen him several times before at their duplex. The positive character of their identifications was unshakable in the face of rigid and effective cross-examination. The defendant's alibi witnesses were impeached by either prior criminal records or familial relationship. The defendant's initial flight from the attempted arrest is, under current law, a circumstance from which guilt may be inferred. The jury resolved in the state's favor any inconsistencies in the

prosecution's proof; that is an essential part of their function.

This issue has no merit.

## II

Tyrone Johnson was not permitted to testify that he overheard the victims tell police that they could not identify their assailant because his face was covered, but they could identify his clothing. The defendant claims the evidence is admissible under the excited utterance exception to the hearsay rule.

■ In order to qualify under this exception, there must first be a showing that the declarant made the statement in an excited state due to a startling event; normal reflective thought processes must be rendered inoperative. Secondly, the statement must have been a spontaneous reaction to the occurrence, not the result of reflective thought, so as to minimize the opportunity for conscious fabrication. *McCormick's Law of Evidence*, § 297 at 854–855 (3rd Ed.1984); D. Paine, *Tennessee Law of Evidence*, § 66 (1974); *State v. Carpenter*, 773 S.W.2d 1 (1989).

■ The application of the exception is left in great measure to the discretion of the trial court with the primary consideration being whether the comments are, because of the circumstances, reliable. *McCormick*, supra, § 297 at 854–855; *Shelton v. State*, 460 S.W.2d 869 (Tenn. Crim.App.1970).

■ There was no abuse of discretion on the part of the trial judge in this case in determining that the testimony did not qualify as an excited utterance. The reflection necessary to recollect the course of events in making a statement to the police, by its very character, disqualifies the statement as an excited utterance. Burns went to a nearby phone to contact police, both victims awaited their arrival, and each was required to recall, to the extent possible, the details of the robbery. The robbery itself would have been sufficiently startling to meet the requirements of the first prong of the test; what Johnson allegedly overheard was not, however, a spontaneous reaction to the occurrence. Although the victims were undoubtedly still excited by the course of events, the statement was nonetheless a recollection of the events made in response to the police investigation.

This issue has no merit.

## III

■ After the direct testimony of Coleman Beard, criminal investigator for the Metropolitan Davidson County Public Defender's Office, the state demanded his notes of the interviews with Burns as *"Jencks* material," pursuant to Rule 26.2, Tennessee Rules of Criminal Procedure.[1]

His notes were "excerpts ... taken during a phone conversation" with Burns and were made "to keep [him] apprised of the ... things [he] felt were major...." The trial court examined the notes, provided a copy to the state, and allowed cross-examination. The applicable rule defines *Jencks* material as follows:

(1) A written statement made by the witness that is signed or otherwise adopted or approved by him; or

(2) A substantially verbatim recital of an oral statement made by the witness that is recorded contemporaneously with the making of the oral statement and that is contained in a stenographic mechanical, electrical, or other recording or transcription thereof.

Rule 26.2(g), Tenn.R.Crim.P.

There is no contention that the victim signed, adopted or approved the report prepared by the investigator; therefore, the first section of the rule, 26.2(g)(1), is inapplicable.

It is equally apparent that the document does not come within the purview of Rule 26.2(g)(2). The record does not establish that there was any contemporaneous recording of the interview.[2] The holding that

1. *Jencks Act*, 18 U.S.C. § 3500; *See* also Federal Rules of Criminal Procedure 26.2.

2. *See State v. John Farmer*, No. 88–282–III, 1989 WL 137899 (Tenn.Crim.App., Nashville, Nov. 17, 1989).

the notes constituted *Jencks* material was error. *See State v. Daniel,* 663 S.W.2d 809, 811–812 (Tenn.Crim.App.1983).

█ The thrust of the cross-examination of Beard was to discredit the quality of his testimony. In closing argument, for example, the prosecutor emphasized the brevity of the notes, referred to them as "garbage," and suggested the witness was "probably the world's laziest investigator." For these reasons, the defendant contends that the error was not harmless. *See* Rule 52(a), Tenn.R.Crim.P.

Beard's interview with Vestal established that she claimed to have seen the defendant on August 9, two days before the robbery—a time the defendant was incarcerated on another charge. He also recalled that Vestal said that the defendant wore the same "jammer top" on August 9 as he wore on August 11 during the robbery. During direct testimony, Beard became confused as to whether Vestal or Burns made a more positive description (on a scale of 10) of the defendant. The time the investigator spent on this case was estimated at two to three hours, including his interview with the victims. During cross-examination, the state established that the investigator believed there to be one rather than two street lights in the vicinity; he believed it to be some 50 yards away. Although he deemed it important, the investigator admitted that he did not measure the distance or observe the amount of illumination cast by the street light. The crime, of course, occurred during the dark. He admitted that he did not go back to the site after he learned that the crime occurred at night. He had no recollection of the date of the first interview with the primary victim. The investigator also got confused about which of the two victims he talked to twice and which he talked to only once and was incorrect about the date of his interview with the victims.

The material in question was described as follows:

[The] notes or scribbling taken during a phone conversation that are just excerpts of things that I ... felt were important to me to remember that I wrote down in basically my own way of remembering it.
Q. In fact, you—most of the papers comprised of doodling on your part; is it not?
A. That's correct.

The subject of cross-examination after production of the investigator's notes established that the notes made no mention about the investigator actually making a physical inspection of the scene. The district attorney also established that the investigator made mental rather than physical notes regarding the description of the clothes the defendant wore. There were no notes summarizing the statements of the victims:

Q. So all your notes are mental notes; right?
A. That's correct.
Q. Just your recollection of what those two ladies said.
A. Sure.

On direct examination, it was established that counsel for the defendant was present during the interviews. The investigator testified that because defense counsel took detailed notes of the interviews, he did not.

The trial court would not, as the district attorney requested, allow the investigator's notes to be passed to the jury for inspection.

It is apparent that the investigator did not make an effective witness for the defendant. His testimony had been impeached considerably by the time the district attorney asked for and received the few notations made. While the cross-examination which ensued thereafter further impeached his testimony, the investigator made use of the documents to rehabilitate his earlier mix-up of Vestal and Burns. Redirect examination established that the paucity of the investigator's notes was the result of counsel's undertaking that chore during the course of the interviews. The trial judge refused to permit the notes to be passed to the jury, thereby mitigating, in part, any adverse effect.

In summary, considering the whole record, the error probably did not affect

the judgment or prejudice the judicial process. Rule 36(b), Tenn.R.App.P. Any lack of diligence on the part of the investigator was not essential to the central question of the validity of the eyewitnesses' identification of the defendant.

## IV

The defendant contends that the trial court failed to give appropriate curative instructions after improper prosecutorial comment during closing argument. The prosecutor stated as follows:

> When Ms. Burns gets back later that morning, who shows up? Who shows up? Why do criminals return to the crime scene? Why does a criminal when he's torched a place, burned—set afire, why does he always like to watch across the street? Why does a criminal always return to the scene of the crime?

After the comment, the defendant interposed an objection and asked that the jury be instructed to disregard the comment. The trial court sustained the objection but gave no curative instruction.

Later, the prosecutor referred to the witness Beard as "probably the world's laziest investigator." Upon objection, the trial court stated, "Well, I don't think that's a proper characterization of Mr. Beard." Otherwise, no curative instruction was provided.

Trial judges have traditionally been accorded wide discretion in controlling the arguments of counsel. This discretion will not be reversed absent abuse. *Smith v. State*, 527 S.W.2d 737 (Tenn.1975).

In *Judge v. State*, 539 S.W.2d 340, 344 (Tenn.Crim.App.1976), this court set out several factors to be considered in determining whether improper conduct by the prosecutor could effect prejudice to the verdict:

(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case;

(2) the curative measures undertaken by the trial court;

(3) the intent of the prosecutor in making improper argument;

(4) the cumulative effect of the improper conduct and any other errors in the record; and

(5) the relative strength or weakness of the case.

The first factor does not weigh in favor of reversal. That the defendant returned to the "scene of the crime" was supported by the evidence. The state's proof established that approximately 3½ hours after the offense was committed, the defendant was seen, questioned, and ultimately arrested near the scene of the robbery. That an arsonist was used as an example did not prejudice the defendant; the jury was well aware that the charges in this case were for robbery. Reference to the criminal investigator, a part of the public defender's office, as "probably the world's laziest investigator," however, was, at best, in poor taste. Although there were inconsistencies in his testimony and perhaps deficiencies in the intensity of the investigation, such exaggerated characterizations reflect poorly upon the professionalism of the office of the district attorney general. The point could have been more articulately made. Nonetheless, this court doubts that the comments seriously prejudiced the verdict. The first comment was not improper. Although certainly inappropriate, the second comment probably detracted from the credibility of the state's argument.

By sustaining each objection made by the defendant, the trial court implied that the argument was improper. As to the first comment, the following exchange took place:

**Mr. Jones:** [T]hat statement is entirely inappropriate and out of character. It certainly exceeds the scope of this record. Any characterization that a criminal always returns is a sign. That should be stricken and the jury should be instructed to disregard that.

**The Court:** Alright. That's not a matter in evidence nor an inference from evidence, General. I think I will sustain the objection.

As to the second comment, the jury overheard the following colloquy:

**Mr. Jones:** ... I would object to that—

**General Zimmerman:** Your Honor, that's been raised by the evidence.

**Mr. Jones:** —unnecessary character assault—

**The Court:** Well, I don't think that's a proper characterization of Mr. Beard.

**General Zimmerman:** ... I apologize for it then.

**The Court:** Alright.

The trial court clearly expressed disapproval of the argument. The prosecutor apologized. Little more could have been done to reduce any prejudicial effect. This factor does not indicate prejudice to the defendant.

As to the third factor, the remarks under review indicate no special intent on the part of the prosecutor to prejudice the defendant. The state presented proof that the defendant did in fact return to the scene. The defendant's criminal investigator did not make an effective defense witness. His investigation was arguably inadequate. It was only the exaggerated characterization of the witness that was improper.

The only other error in this record relates to the trial court's misidentification of the investigator's notes as "*Jencks* material." Although the investigator had been effectively cross-examined before the notes were produced, the district attorney general was able to make effective use of the notes. The information gained by the prosecutor from his observation of the notes and the manner in which they were taken surely contributed to the prosecutor's improper characterization of the witness. The record is otherwise free of error. The case was won or lost on credibility of the eyewitness testimony, not that of the criminal investigator. As to the fourth factor, it is unlikely that the cumulative effect of the errors regarding this witness prejudiced the verdict.

The state's case, in this instance, was neither particularly strong nor particularly weak. It was strong only if the jury accredited the eyewitness identifications.

They obviously did so. There was more than sufficient evidence to support the jury's verdict. The defense was simply unable to discredit the victims' identifications either by its alibi or through its independent investigation. The fifth factor weighs in favor of the state.

On balance, it does not appear that the impropriety of the prosecutor's remarks were such as to warrant a new trial.

This issue is without merit.

## V

■ The defendant insists that the trial court's charge of a Tennessee Pattern Instruction on flight was unwarranted by the evidence. See T.P.I.—Crim. § 37.16. The defendant, in this instance, briefly fled on foot when he learned he was to be arrested. Police quickly apprehended him.

The defendant correctly points out that several states have either done away with or limited the instances in which the jury is charged on the law of flight. *See*, for example, *State v. Jefferson*, 524 P.2d 248, 251 (Wash.App.1974); *U.S. v. Telfaire*, 469 F.2d 552 (D.C.Cir.1972); *U.S. v. Robinson*, 475 F.2d 376 (D.C.Cir.1973). In *State v. Humbolt*, 1 Kan.App.2d 137, 562 P.2d 123 (1977), the court of appeals held that the weight to be given any evidence of flight is a matter for counsel to argue and for the jury to determine. Oregon and Colorado have apparently adopted this rationale. *People v. Larson*, 572 P.2d 815 (Colo.1977); *State v. McCormick*, 280 Or. 417, 571 P.2d 499 (1977). Idaho and Colorado hold that the instructions should be given only when the trial court determines that the charge is absolutely essential under the particular facts of the case. *State v. Wrenn*, 99 Idaho 506, 584 P.2d 1231 (1978); *Robbins v. People*, 142 Colo. 254, 350 P.2d 818 (1960). This trend appears to be the result of several cases which indicate that flight from arrest often bears little, if any, relationship to the guilt of the accused.[3] *See Telfaire*,

---

**3.** In *Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 415, n. 10, 9 L.Ed.2d 441 (1963), the Supreme Court observed that it had "consistently doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime."

469 F.2d at 557; *Robinson,* 475 F.2d at 384.

While the defendant does not necessarily suggest that this state has adopted the minority view, he does contend that because he did not "hide out or conceal himself," the charge is not applicable:

> [It] takes *both* a leaving of the scene of the difficulty *and* a subsequent hiding out, evasion or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

T.P.I.—Crim. § 37.16. (Emphasis added.)

We find that the defendant left the scene after the robbery. Although he returned, he evaded officers when they attempted to make an arrest. It was only because he slipped and fell that he was unable to conceal himself from investigating officers. He had been identified as the assailant and denied culpability before he ran. In that respect, the two-pronged test of the Tennessee Pattern Jury Instruction is satisfied.

In *Hall v. State,* 584 S.W.2d 819 (Tenn. Crim.App.1979), however, this court cited 29 Am.Jur. *Evidence,* § 280 at 329 on this issue:

> The fact that a defendant after the commission of a crime concealed himself or fled from the vicinity where the crime was committed, with knowledge that he was likely to be arrested for the crime or charged with its commission, may be shown as a circumstance tending to indicate guilt.

Earlier, in *Rogers v. State,* 2 Tenn.Crim. App. 491, 455 S.W.2d 182 (1970), this court adopted the view set out in 22A C.J.S. *Criminal Law* § 625 on this subject:

> The law makes no nice or refined distinction as to the manner or method of a flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

As recently as *State v. Whittenmeir,* 725 S.W.2d 686 (Tenn.Crim.App.1986), this court cited the language with approval. In appears, therefore, that the pattern instruction is more closely aligned with the *Rogers–Whittenmeir* standard rather than with the decision in *Hall.* Even though the two-pronged test may be more restrictive, the facts in this case nonetheless justify the trial court's instruction on flight. The defendant's evasion of authorities, no matter how brief, met the second part of the test. The guidelines of both *Hall* and *Rogers* were met.

Because this state subscribes to the majority view approving the instruction under appropriate circumstances, this court must hold, even in the face of a well-reasoned minority trend, that the jury charge on the issue of flight was not error.

Accordingly, the judgment of the trial court is affirmed.

DUNCAN and BIRCH, JJ., concur.