IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs at Knoxville October 29, 2019

## STATE OF TENNESSEE v. MARKIST KANTRELL COLE

**Appeal from the Circuit Court for Madison County**
**No. 18297    Roy B. Morgan, Jr., Judge**

_____

### No. W2019-00079-CCA-R3-CD
_____

The Defendant, Markist Kantrell Cole, appeals his convictions for attempted second degree murder, aggravated assault, employing a firearm during the commission of a dangerous felony, and reckless endangerment, alleging that the evidence was insufficient to support his convictions and that the trial court erred by issuing a jury instruction on flight. Following our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and J. ROSS DYER, J., joined.

George Morton Googe, District Public Defender; and Jeremy B. Epperson, Assistant District Public Defender, for the appellant, Markist Kantrell Cole.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Bradley F. Champine, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

On May 1, 2018, the Madison County grand jury returned an indictment charging the Defendant with the attempted second degree murder and aggravated assault of the victim, Travon Jones; employing a firearm during the attempt to commit a dangerous felony; the aggravated assault of a minor, K.H.[1]; and felony reckless endangerment of an

---

[1] It is the policy of this court to refer to minors by their initials. K.H. was fifteen years old at the time of the shooting and sixteen years old when she testified at trial.

unspecified individual or individuals. See Tenn. Code Ann. §§ 39-12-101, -13-102, -13-103, -13-210, -17-1324(b). On the morning of trial, the State dismissed Count 4, the aggravated assault of K.H.

At trial, the victim testified that he was a military veteran and that he previously worked part-time at a convenience store. On November 5, 2017, he was working as a cashier, and at about 5:55 p.m., the Defendant came into the store alone. The victim was not previously acquainted with the Defendant, who appeared to be about sixteen years old. The Defendant asked to buy Black and Mild cigars; the victim asked the Defendant how old he was, and the Defendant responded that he was eighteen. The victim asked to see his identification; the Defendant stated that he did not have identification and that "[t]hey" sold him cigars "during the daytime." The victim responded that he needed to see the Defendant's identification. The Defendant said, "Oh, man, you [aren't] going to sell me cigarettes?" The victim affirmed that if the Defendant did not show identification, there was "nothing [the victim could] do for" the Defendant. The victim stated that it was his practice to ask customers for identification when buying tobacco products because he was not good at guessing customers' ages.

The victim testified that the Defendant began to walk away, then turned around and called the victim a "b--ch a-- n---er." The victim stated that the Defendant "wasn't too happy" and "appear[ed] upset." The victim asked the Defendant what he said, and the Defendant repeated the phrase. The Defendant walked to the door and told the victim to "come outside." The victim responded, "Hey, little boy, you better get your a-- out of here." The victim noted that three to five other people were waiting in line behind the Defendant. The victim stated that he did not take the Defendant's statements personally and that he laughed because the Defendant was a "knucklehead kid." The victim denied yelling at the Defendant or being angry. The victim characterized the interaction as "just like dealing [with] somebody talking. You know how kids talk crazy." The Defendant left.

The victim testified that about five minutes later, the Defendant returned to the store and again urged the victim to come outside. The victim responded, "Hey, little boy. I told you [that you] better get your a-- out of here." The victim stated that he "didn't really think anything else of it" and continued checking out the line of customers. Three to five minutes later, the Defendant again returned to the store and told the victim to come outside. The victim did not "take that to mean anything in particular." The victim noted that on occasion, intoxicated people came to the store, became "irate," and harassed customers in the parking lot. On those occasions, the victim would "go to the door and just kind of shoo them off." The victim had never had to call the police and noted that "most of the time folks respect[ed]" him.

The victim testified that about five minutes later, he finished up with the other customers and went to the front door to see if the Defendant was outside "causing problems." The victim generally carried a weapon for self-defense; on that day, he carried a nine-millimeter handgun in his front right pocket. The victim noted that he had a valid handgun carry permit from Wisconsin, which was reciprocally valid in Tennessee. The victim had received extensive firearms training in the military. The victim did not anticipate being shot as he walked to the front door. When the victim reached the door, he opened it, looked for the Defendant, and eventually spotted him walking away about twenty-five feet from the door. The victim denied having the gun out or having his hand on the gun, and he noted that for a handgun, twenty-five feet was not an "easy shot."

The victim testified that the front door had a bell that would have sounded when he opened it; he "guess[ed]" that the Defendant heard the bell because the Defendant turned around when the victim opened the door. The Defendant was accompanied by "two or three young ladies," including K.H., who also turned around and walked with the Defendant. The victim noted that he did not know the young women personally, although he was now aware of who K.H. was, and that to his knowledge, they had not been inside the store. The Defendant walked toward the victim "with a purpose" and said something unintelligible; the victim expressed that he could not hear the Defendant; the Defendant said something else unintelligible; the victim asked, "What's up, man?"; and the Defendant reached into the pocket of his hooded sweatshirt and pulled out a nine-millimeter handgun.

The victim testified that he was "really caught . . . off guard" because he and the Defendant had not argued and "nothing warranted that with [their] conversation." The victim stated that he "hesitated a little bit" and that the Defendant shot the victim in his right shin. The victim said, "Son of a b--ch shot me in my leg," and the victim pulled out his handgun and shot twice at the Defendant, but missed. The victim noted that he had been trained to "neutralize the situation" and did not want to be reckless because other people were present and he was not within close enough range to be certain to hit the Defendant and miss others. The victim stated that the Defendant stopped advancing and kept shooting; the victim was unsure whether the Defendant's companions fled.

The victim testified that the Defendant fired seven to ten times, that the Defendant shot the victim a second time in the side of his left leg, and that a third bullet hit the victim's right leg. The victim stated that another employee was inside the store and that some of the Defendant's bullets went into the building and shattered the front door. The victim stepped back inside the store for shelter and was bleeding heavily. The Defendant left, although the victim did not see where he went, and an unknown person called the police.

The victim testified that the police arrived five to eight minutes later; in the interim, the victim called the store owner and asked someone to call him an ambulance. The victim stated that he was able to move in spite of his injuries. The victim did not leave or hide his handgun, and he informed the first responding officer that he was armed. The officer applied a tourniquet to the victim's leg wound first and eventually asked for the victim's carry permit and handgun, which the victim provided. The victim agreed that his gun held seven bullets when fully loaded and that after firing twice, five bullets would have remained. The victim gave statements to the responding officers at the scene and the hospital. The victim also identified the Defendant in a photographic lineup.

The victim displayed for the jury the scars left by the gunshot wounds to his right leg. He stated that the two bullets were unable to be removed and that he had lead permanently inside his body. The victim said that as a result of the incident, he could not go back to the convenience store because he was "too paranoid" and could not stand on his leg for a long duration. The victim averred that he would not have fired his gun at the Defendant, only doing so because he was fired upon first.

On cross-examination, the victim testified that he was not aware that he should have filed paperwork with the State of Tennessee to transfer his carry permit to Tennessee after residing in Tennessee for six months. The victim did not know if the convenience store had surveillance cameras. The victim acknowledged that at the preliminary hearing, he testified to having been shot twice. He explained that the third gunshot wound was a "scape," meaning not a full gunshot wound. The victim pointed out a portion of the preliminary hearing transcript that referred to the victim's "escaping." He stated that he had, instead, said "scaping" referring to the nature of the third gunshot wound, and that the transcript contained a typographical error.

The victim acknowledged that in his statement to Jackson Police Investigator Darrell Listenbee, he may have stated the Defendant fired six shots. The victim said that he could not say with certainty how many shots were fired, although he knew the Defendant shot more than twice. The victim further acknowledged that he did not mention in the statement the Defendant's telling the victim to come outside or the Defendant's saying anything to the victim before opening fire. The victim noted that he spoke to Investigator Listenbee at the hospital and that he had been given morphine for his injuries. The victim acknowledged that at the preliminary hearing, he was unable to identify the type or color of the Defendant's handgun. The victim denied "relying on anyone else for information" for his trial testimony. The victim said that it made sense for others to have left the scene while shots were being fired.

On redirect examination, the victim testified that he had three wounds to his legs, that during the shooting he focused on surviving, that he had always characterized his

-4-

count of the Defendant's shots as approximate, that his written statement did not deny the Defendant said anything before opening fire, and that his written statement included that the Defendant "poke[d]" his head in the door multiple times and cursed at the victim. On recross-examination, the victim affirmed that the Defendant told him to come outside and said that he gave his police statement "to the best of [his] ability" given that "[a]fter [he was] shot, you know, everything [was] not gonna come out just verbatim and clear[.]"

Jackson Police Officer Daniel Melson testified that he responded to the crime scene and collected shell casings and a bullet fragment. The bullet fragment was located against a cinder block wall two to three feet inside the store, indicating that it was shot into the store. One bullet casing was collected from outside the entrance to the store, and seven casings were recovered fifty to one hundred feet north of the store. Officer Melson opined that the casings were spread out in a line "as if somebody was fleeing the scene and shooting at the same time." Officer Melson agreed that the line of casings "appeared to be moving away" from the store.

On cross-examination, Officer Melson testified that if more than one shot had been fired from the front of the store, he would have expected to recover more shell casings from that area. He agreed that the seven shell casings further from the store were not consistent with a shooter standing still. Officer Melson acknowledged that he did not know "which one of those shell casings was spent before the other one, out of any of them," and that he did not know who shot first.

On redirect examination, Officer Melson testified that he did not always find every shell casing at a crime scene, that casings could travel some distance, and that a casing could be kicked away while a person was running. Officer Melson stated that the crime scene was dark.

Nickedra Goff stated that the Defendant was a close friend who was "like a brother" and agreed that it was difficult for her to testify. Ms. Goff made known that she did not wish to testify.

Ms. Goff testified that she was with the Defendant on November 5, 2017, that she did not go inside the convenience store, and that she was not involved with what happened between the victim and the Defendant. Ms. Goff stated that she has never met the victim before. When asked what the Defendant said when he came out of the convenience store initially, Ms. Goff said that she was unsure. Ms. Goff acknowledged giving a statement to Investigator Listenbee, although she noted that "what's on [her] statement . . . was -- out of anger."

Ms. Goff further acknowledged that in her statement, she said that when the Defendant emerged from the store, he said, "I fixin' to pop this n---a. He got me f---ed

up." Ms. Goff reiterated that she made the statement because was angry that her cousin, K.H., had been shot. Ms. Goff agreed that in her statement, she said that they began to leave the area when the victim "came from the store and [stood] in the doorway" to get their attention. She told Investigator Listenbee that the victim said to the Defendant, "What['s] that s--t you was talking[?]" Ms. Goff's statement reflected that the Defendant "pulled out his gun when [the victim] was standing in the door following [them]."

Ms. Goff acknowledged that in her police statement, she said that the Defendant pulled out his gun and pointed it at the victim. She repeated, though, that she "was speaking out of anger. So it really doesn't matter." Ms. Goff stated that she conveyed to Investigator Listenbee that she was in shock and speaking out of anger. She acknowledged, though, that she had the opportunity to review the statement and ask for corrections to be made before initialing and signing the statement. Ms. Goff said that after the Defendant pulled out his gun, she ran away, heard a "lot" of gunshots, and did not see what happened. Ms. Goff eventually ran back to K.H. and encountered Investigator Listenbee some time later.

On cross-examination, Ms. Goff testified that she went to the convenience store with the Defendant, her brother, and K.H., and that she did not see what happened inside the store. Ms. Goff denied that the Defendant went back inside the store at any point. She said that the Defendant "just walked off" and that afterward, the victim came to the door and was "talking stuff." She said that everyone turned around "in shock," and she denied that she or her brother responded to the victim. Ms. Goff was unsure whether the victim had a gun, although she noted that her brother exclaimed, "Oh, s--t" as if the victim had "something." Ms. Goff did not know who shot first.

Ms. Goff identified her voice on an audio recording of her police interview. She acknowledged that in the recording, she said that the victim shot, then the Defendant shot, then the victim "kept shooting." Ms. Goff agreed that the Defendant was leaving with the group when the victim came outside.

On redirect examination, Ms. Goff testified that she "saw fire" but did not see who was shooting, including who shot K.H. Ms. Goff acknowledged telling Investigator Listenbee that she did not remember seeing the victim with a gun; she said, though, that she was in shock and "couldn't see anything at the time" and that the victim "had something on his side," but she was not certain if it was a gun. Ms. Goff agreed that she did not actually know who shot first because she started to run when she heard shots. Ms. Goff and her brother ran away first, but K.H. was "stuck."

Jackson Police Officer Billy Cathey testified that he responded to the crime scene and found the victim leaning against the counter of the convenience store, bleeding from a gunshot wound to the right leg. Officer Cathey did not render first aid, and to his

-6-

knowledge, no one placed a tourniquet on the victim's leg. Officer Cathey collected the victim's handgun from his pocket. Officer Cathey noted that the victim informed Officer Cathey he was armed and cooperated with all commands. Officer Cathey identified the handgun and five unspent bullets recovered from the gun. Officer Cathey did not collect the victim's handgun carry permit. On cross-examination, Officer Cathey acknowledged that he was not present during the shooting and did not know when the victim's gun was loaded or shot.

Jackson Police Officer Joseph Benjamin Mitchell testified that he responded to the crime scene and took photographs depicting the victim's wounds, a trail of blood inside the store, the store's shattered glass, and the shell casings.

Investigator Listenbee testified that he administered the photographic lineup to the victim and took statements from K.H., Ms. Goff, Mr. Goff, and the Defendant. Investigator Listenbee noted that the Defendant's interview took place two days after the incident, when the Defendant turned himself in, and that an arrest warrant had been issued by that time. Investigator Listenbee typed the Defendant's statement and allowed the Defendant to review it before signing.

The Defendant's written statement was received as an exhibit and reflected that on November 5, 2017, the Defendant went to the convenience store with K.H., Ms. Goff, Mr. Goff, and a person named "Dre" to buy cigars. The Defendant went into the store, and the victim told him that he looked too young to buy cigars and "to get [the Defendant's] young a-- out [of] the store." The Defendant "exchanged words back and forth" with the victim before leaving. The Defendant stated that he was standing in the parking lot when the victim opened the door and said, "What's all that s--t you were talking?" The Defendant responded, "What[?]" The Defendant said that the victim was standing at the door "with his hand in the front of his hoodie" and pulled out a black gun. The Defendant "quickly pulled out [his] gun" from the pocket of his own hooded sweatshirt, fired at the victim, and hit him in the leg. The victim fired back two times, and the Defendant fired an additional three times. The Defendant noted that K.H. was standing next to him and that he thought the victim's second shot hit her. The Defendant ran away and accidentally dropped his gun "in the field near Neff Street and Whitehall Street."

A video recording of the Defendant's police interview,[2] which was received as an exhibit, was generally consistent with the written statement. In the interview, the

---

[2] The disc containing the recording of the Defendant's interview also contained audio recordings of the interviews with Ms. Goff, Mr. Goff, and K.H. Only the recordings of the Defendant's and K.H.'s interviews were entered as exhibits at trial. As noted by the trial court during jury deliberations, although a small portion of Ms. Goff's interview was played to refresh her recollection, it was not entered as an

Defendant stated that the victim's gun was in the pocket of his hooded sweatshirt. An officer asked the Defendant if the gun was in the victim's pants pocket, and the Defendant answered negatively and repeated that the victim carried his gun in the same way the Defendant did, in his sweatshirt pocket. The Defendant stated that he fired the first shot. Later in the interview, the Defendant stated that he carried a gun to protect himself and K.H., his "sister," and that he yelled to his friends to "get back." The Defendant asserted that he had done nothing wrong, that the victim provoked him, and that he turned himself in because he was innocent and wanted people to know what happened.

Investigator Listenbee testified that in the Defendant's statement, he acknowledged having been at the store, arguing with the victim, and being the first person to fire his gun. The Defendant also acknowledged having shot the victim; Investigator Listenbee noted, though, that the Defendant's statement regarding the number of shots he fired was not consistent with the evidence at the crime scene. The Defendant asked Investigator Listenbee to add to the statement that he dropped his gun accidentally. Investigator Listenbee stated that police officers and a K-9 unit searched for at least one hour the location in which the Defendant claimed to have dropped his gun, but no gun was found. Investigator Listenbee acknowledged that it was possible another person picked up the gun.

Investigator Listenbee testified that the victim and the Defendant gave differing accounts of where the victim's gun was located. Investigator Listenbee agreed that officers recovered the gun from the victim's pants pocket. Investigator Listenbee confirmed that the Defendant was age eighteen and not old enough to legally carry a gun. Investigator Listenbee agreed that the Defendant claimed to have drawn and fired his gun while the victim was still in the process of drawing his own gun. Investigator Listenbee stated that the Defendant repeatedly said the victim shot K.H. and that it "seem[ed] important to him" the officers knew this fact. The Defendant referred to K.H. as his sister and said that he visited her in the hospital. Investigator Listenbee stated that based upon speaking to K.H., he understood that she and the Defendant had a close relationship; he agreed that if K.H. believed the Defendant shot her, it would be "very bad for him and their relationship."

Investigator Listenbee testified that although the Defendant stated in "one version of the story" he yelled, "Get back," this was not corroborated by any other witnesses. Investigator Listenbee stated that the Defendant's "demeanor definitely changed" when they discussed the victim's refusing to sell him cigars.

---

exhibit. Mr. Goff did not testify at trial, and the content of his interview was not referenced.

On cross-examination, Investigator Listenbee affirmed that he was not present during the shooting, that no ballistic or forensic evidence was obtained other than the shell casings and the victim's gun, and that he relied upon the witness statements in this case. Investigator Listenbee agreed that the Defendant voluntarily turned himself less than forty-eight hours after the shooting and that the Defendant voluntarily waived his rights and gave a statement that included the route by which he fled. Investigator Listenbee acknowledged that although the Defendant seemed upset while recalling his argument with the victim inside the store, no shooting took place inside the store. Investigator Listenbee agreed that when the victim came outside, the Defendant was walking away and that according to both Ms. Goff and the Defendant, the victim asked the Defendant, "What's that s--t you're talking?" Investigator Listenbee did not know whether K.H. stood between the victim and the Defendant during the shooting. He acknowledged that the Defendant had been charged with shooting K.H. and that the charge had been dismissed the morning of trial.

On redirect examination, Investigator Listenbee testified that the shattered glass in the convenience store was inside the store, indicating that bullets went into the store rather than being fired from inside it. Based upon his experience, it was common for defendants to give self-serving police statements, to change certain details of the relevant events, and to forget "details that end up proving unfavorable to them later." Investigator Listenbee agreed that such details included the number of shots fired, the location of the victim's gun, and the location in which the Defendant's gun was dropped. Investigator Listenbee stated that the Defendant was charged with the aggravated assault of K.H. based upon her police statement and that the charge was dismissed based upon K.H.'s continual lack of cooperation with the investigation.

On recross-examination, Investigator Listenbee stated that K.H. testified at the preliminary hearing and that she was subpoenaed to testify at trial. He noted, though, that appearing in response to a subpoena did indicate that she wanted to cooperate. He stated that although the location from which the victim drew a gun was "semantics," the consistency of witness statements was important. He added that the Defendant was given the opportunity to clarify from which location the victim drew his gun.

At the conclusion of the State's proof, the trial court address the parties out of the presence of the jury and discussed the State's requested jury instruction on flight. Defense counsel objected, arguing that "there wasn't a hiding out," that everyone left the scene during the shooting, and that the Defendant turned himself in less than forty-eight hours later. The court reviewed the text of the pattern jury instruction and found that the evidence justified charging the jury with flight.

K.H. testified for the defense that she was the Defendant's friend and that on November 5, 2017, she went to the convenience store with the Defendant, Ms. Goff,

"Deondre," and Mr. Goff. The Defendant went inside to buy cigars, and Deondre also entered the store sometime afterward. The Defendant returned outside and told the group that he could not get the cigars. K.H. denied that the Defendant went back inside the store or "pop[ped] his head in and out[.]" She stated that the victim, whom she did not know previously, came outside and asked what the Defendant was saying. The group was standing close to the store "[b]eside a pole" and was "[b]ooking" when the victim came outside.

K.H. testified that the victim had a gun "on the side of his pocket"; she also said, though, that the victim had the gun in his hand. She stated that "they started shooting." When asked who shot first, K.H. responded, "[The Defendant] -- Not [the Defendant] but [the victim]. That's what I saw. That's the gun I saw [shoot] first[.]" K.H. marked on an aerial photograph where the victim, the Defendant, and K.H. stood during the shooting. According to the diagram, K.H. stood between the victim and the Defendant. K.H. stated that her right hip was toward the victim and that her left hip was toward the Defendant. K.H. was shot in the right hip during the exchange of fire. K.H. averred that the victim shot her.

K.H. testified that she saw the victim's gun first and that "he triggered first," although "both of them had their gun[s] at the same time." K.H. stated that the victim was "real . . . mad" when he emerged from the store. K.H. stated that she had cooperated with the investigation and that she met with defense counsel a couple of times. K.H. said that she had a "little bit" of a problem speaking to Investigator Listenbee, although she talked to him. She denied that Investigator Listenbee asked her any questions. K.H. affirmed that her testimony was the truth and not a result of her friendship with the Defendant.

On cross-examination, K.H. testified that she would not characterize her friendship with the Defendant as close. K.H. stated that the Defendant went into the store alone and that when he returned, he was not angry that the victim would not sell him cigars. K.H. said that she and the Defendant felt he was disrespected when the victim "said get the f--k out [of] the store." K.H. said that if the victim and the Defendant both said that the Defendant shot first, they would be lying. K.H. agreed that she "alone [knew] what really happened" and that her testimony was trustworthy. She reiterated that both men started shooting at the same time. K.H. acknowledged, though, that this was not what she told Investigator Listenbee. K.H. read portions of her police statement, which were as follows:

> . . . [The victim came] to the door and sa[id,] "What did you say[?]" to [the Defendant]. [The Defendant] said "What[?]" to [the victim] and was pointing a gun at [the victim]. [The victim] was standing at the door of the store with his hand on a gun that was in his pocket. [The Defendant]

-10-

started to lower his gun and [the victim] pulled his gun and started shooting. After [the victim] started shooting, [the Defendant] started shooting his gun toward [the victim]. [K.H.] heard a total of [five] gunshots. [She thought] that [she] was hit by the first shot.

K.H. did not recall making this statement and stated that she had been given "a whole lot of drugs, medicine" in the hospital when she spoke to Investigator Listenbee. K.H. stated that she gave the statement because she "really didn't feel like talking" and "really wanted [Investigator Listenbee] out." She denied changing her story to protect the Defendant. K.H. stated that she also told the truth in her first statement and that Investigator Listenbee "[p]robably" misheard her. She said that the written statement contained "[her] words, but it[ was] not true." K.H. averred that even though she told Investigator Listenbee that the victim's gun was in his pocket, the victim in fact had the gun in his hand beside his pocket. She asserted that she never said that the Defendant pointed a gun at the victim and that she did not remember whether she said the victim had his hand on a gun in his pocket.

K.H.'s audio-recorded statement was played for the jury and received as an exhibit. In the recording, K.H. consistently described the initial part of events. She stated that the victim came outside asking, "What [did] you say, come outside, what [did] you say?" K.H. stated that the Defendant looked at the victim, noticed a gun in the victim's pocket, and "pointed" at the victim. The victim shot three times, striking K.H. once; she said that the Defendant saw K.H. running and shot at the victim twice. Investigator Listenbee interjected and emphasized that he needed K.H. to be truthful.

At this point, an unidentified doctor came in and discussed K.H.'s injuries; she reported that her pain was a seven or eight out of ten, and the doctor promised to get her pain medication. Investigator Listenbee resumed questioning and told K.H. that he had interviewed other people who were with her and that the information he had received did not match K.H.'s version of events. K.H. stated that the Defendant had a gun and that when she said he "pointed" at the victim, she meant that he pointed a gun at the victim. Investigator Listenbee stated that if K.H. needed to use the word gun if that was what she meant. K.H. recounted the story, clarifying for Investigator Listenbee that Dre went inside the store, that the victim stood in the store's doorway, and that Dre came outside after the shooting. K.H. stated that when the victim came outside, he was "clutching his gun in his pocket," although at the time she was not certain it was a gun. K.H. stated that when the Defendant said "what" to the victim, the Defendant already had his gun out. K.H. said, though, that the victim shot first and the Defendant returned fire. She heard five gunshots in total. K.H. stated that the first shot hit her, that she attempted to run away, and that she stopped at a nearby location. Investigator Listenbee read a written version of the statement to K.H. and asked whether she had any corrections.

-11-

K.H. acknowledged the recording, but she said that the portions of the statement referencing the location of the victim's gun and the Defendant's pointing a gun at the victim were "not what [she] meant to say." K.H. denied that anyone told her not to testify, other than her mother.[3] K.H. said that she was upset the victim had not been charged with shooting her. When asked how she knew who shot her in the back, K.H. responded, "I don't know like that, but I know who it is, yes." K.H. stated that the first shot fired was the one that hit her; she acknowledged that if the Defendant were the first to have fired his gun, as indicated by other witnesses, the Defendant would have been the one who shot her.

On redirect examination, K.H. denied that Investigator Listenbee told her "what words to use" in her statement. K.H. acknowledged that she did not initially state that the Defendant had a gun and that Investigator Listenbee told her that she needed to use the word "gun." K.H. said that while the interview was taking place, she was in her hospital room with her mother and that doctors were "coming in and out." K.H. averred that she was honest in her initial police statement, at the preliminary hearing, and at trial.

On recross-examination, K.H. testified that before Investigator Listenbee told her to use the word gun, she had already stated that the Defendant and the victim both had guns. She acknowledged previously stating that the victim's gun was silver. She denied that Investigator Listenbee "put . . . words in [her] mouth."

Upon the conclusion of the proof, the parties stipulated that whether or not the Defendant or the victim had a valid handgun carry permit was irrelevant to the issue of the Defendant's guilt. The jury found the Defendant guilty as charged. The trial court merged Count 1, attempted second degree murder, with Count 2, aggravated assault, and imposed an effective sixteen-year sentence in confinement. The Defendant timely appealed.

## ANALYSIS

### I. *Sufficiency of the Evidence*

The Defendant contends that the evidence was insufficient to support his convictions because the witnesses, apart from the victim, testified that the victim was the primary aggressor, essentially arguing that the jury should have accepted his claim of self-defense. The State responds that it is the province of the jury to accept or reject self-defense claims.

---

[3] K.H.'s mother was escorted from the courtroom during K.H.'s testimony after she made a gesture at K.H. mimicking a zipper closing over her mouth.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. <u>See</u> <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." <u>Id.</u>; <u>see</u> <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. <u>State v. Dorantes</u>, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." <u>Id.</u> (quoting <u>State v. Hanson</u>, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." <u>State v. Sisk</u>, 343 S.W.3d 60, 67 (Tenn. 2011).

Second degree murder is statutorily defined as the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). Our supreme court has determined that second degree murder is a "result of conduct" offense. <u>See</u> <u>State v. Brown</u>, 311 S.W.3d 422, 431-32 (Tenn. 2010); <u>State v. Ducker</u>, 27 S.W.3d 889, 896 (Tenn. 2000). Here, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). Whether a defendant acts knowingly is a question of fact for the jury. <u>See</u> <u>State v. Inlow</u>, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). The jury may infer a defendant's mental state from "the character of the assault, the nature of the act and from all the circumstances of the case in evidence." <u>Id.</u> at 105; <u>see also</u> <u>Brown</u>, 311 S.W.3d at 431. Criminal attempt requires proof that a person "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3). "Conduct does not constitute a substantial step . . . unless the person's entire course of action is corroborative of the intent to commit the offense." Tenn. Code Ann. § 39-12-101(b).

-13-

An aggravated assault occurs when the defendant intentionally or knowingly causes serious bodily injury to another. Tenn. Code Ann. §§ 39-13-101, -102(a)(1)(A)(i). "Serious bodily injury" is a bodily injury that involves either (1) a substantial risk of death; (2) protracted unconsciousness; (3) extreme physical pain; (4) protracted or obvious disfigurement; (5) protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or (6) a broken bone of a child twelve years old or less. Tenn. Code Ann. § 39-11-106(a)(34).

Reckless endangerment is committed when a person "recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-13-103(a). Reckless endangerment is a Class E felony when committed with a deadly weapon. Tenn. Code Ann. § 39-13-103(b). "[F]or the threat of death or serious bodily injury to be 'imminent,' the person must be placed in a reasonable probability of danger as opposed to a mere possibility of danger." State v. Payne, 7 S.W.3d 25, 28 (Tenn. 1999). "Additionally, in order to convict an accused of reckless endangerment, 'the State must show that a person or class of persons were in an area in which a reasonable probability of danger existed.'" State v. Goodwin, 143 S.W.3d 771, 778 (Tenn. 2004) (citing Payne, 7 S.W.3d at 28).

"It is an offense to employ a firearm during the [a]ttempt to commit a dangerous felony." Tenn. Code Ann. § 39-17-1324(b). "Dangerous felony means [a]ttempt to commit second degree murder, as defined in §§ 39-13-210 and 39-12-101." Id. § (i)(1)(B).

In addition, the Defendant claimed self-defense at trial. When a defendant relies upon a theory of self-defense, the State bears the burden of proving that the defendant did not act in self-defense. State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001). Further, it is well-settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact. See State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). "Encompassed within that determination is whether the defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault." State v. Thomas Eugene Lester, No. 03C01-9702-CR-00069, 1998 WL 334394, at *2 (Tenn. Crim. App. June 25, 1998) (citing State v. Renner, 912 S.W.2d 701, 704 (Tenn. 1995)). It is within the prerogative of the jury to reject a claim of self-defense. See Goode, 956 S.W.2d at 527. Upon our review of a jury's rejection of a claim of self-defense, "in order to prevail, the defendant must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994).

In the light most favorable to the State, the evidence established that after the victim refused to sell cigars to the Defendant, the Defendant repeatedly urged the victim to come outside the convenience store. Although the Defendant was walking away from the store when the victim came to the door, upon the victim's opening the door, the Defendant turned around, pointed a gun at the victim, and fired approximately seven shots at him. The Defendant admitted to firing the first shot. At least one other employee and, by some witness accounts, the Defendant's friend Dre were inside the store as the Defendant fired into it, shattering the glass door. In addition, K.H. stood between the Defendant and the victim as the Defendant fired; regardless of who struck K.H., she was endangered by the Defendant's shooting. The victim was struck in both legs; one of his wounds bled profusely; and he had continuing pain, emotional distress, and functional limitations as a result of his injuries. It is undisputed that the Defendant used a firearm during the commission of the offenses.

A reasonable juror could have found that the Defendant's self-defense claim was not well-founded. The jury credited the victim's testimony that he had not drawn his gun when the Defendant opened fire; even assuming that the Defendant's police statement reflected his perception of events, the Defendant's use of deadly force was unreasonable, as the victim had not pointed the gun at the Defendant, shot at him, or otherwise threatened to use deadly force. In addition, the Defendant was not without fault in the encounter because he turned and walked toward the victim when the victim came outside, engaging further rather than continuing to walk away.

Similarly, the Defendant's reliance on Ms. Goff's and K.H.'s testimony that the victim fired first is misplaced. Both witnesses were the Defendant's friends, made inconsistent statements, and were thoroughly impeached by the State. It was the province of the jury to discredit part or all of their testimony. We will not substitute our judgment for that of the finder of fact or reweigh the evidence. The evidence was sufficient to support the Defendant's convictions, and he is not entitled to relief on this basis.

### III. *Flight Instruction*

The Defendant contends that the trial court erred by instructing the jury on flight, arguing that a reasonable person would have fled when being fired upon and that the Defendant turned himself in within forty-eight hours. The State responds that the trial court correctly included a jury instruction on flight because the Defendant left the scene, waited forty-eight hours to turn himself in, and disposed of the murder weapon and misled police as to its location. Moreover, the State asserts that any error should be considered harmless.

A defendant in a criminal case "has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on

proper instructions." State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); see State v. Leath, 461 S.W.3d 73, 105 (Tenn. Crim. App. 2013). When reviewing jury instructions on appeal to determine whether they are erroneous, this court must "review the charge in its entirety and read it as a whole." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). A jury instruction is considered "prejudicially erroneous," only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." Id. Because the propriety of jury instructions is a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. Carpenter v. State, 126 S.W.3d 879, 892 (Tenn. 2004).

The trial court can only charge the jury on flight if there is sufficient evidence to support the instruction. Berry, 141 S.W.3d at 588. There is sufficient evidence to support a jury charge on flight when there is proof the defendant left the scene of the crime and of a "subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown." State v. Burns, 979 S.W.2d 276, 289-90 (Tenn. 1998) (quoting State v. Payton, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989)). The subsequent hiding out, evasion, or concealment requirement can be satisfied by evidence from which a jury might infer that a defendant committed this act. See State v. Joshua Hill-Williams, No. W2015-01743-CCA-R3-CD, 2017 WL 1907735, at *12 (Tenn. Crim. App. May 9, 2017); State v. Terrance Wilks, No. W1999-00279-CCA-R3-CD, 1999 WL 1097832, at *4 (Tenn. Crim. App. Nov. 22, 1999). "Any contradictory evidence that serves to rebut the [S]tate's proof merely raises a question for the jury to resolve." Payton, 782 S.W.2d at 498. The defendant may rebut evidence of flight by a "credible explanation of some motive other than guilt." Hall v. State, 584 S.W.2d 819, 821 (Tenn. Crim. App. 1979).

In the present case, the State requested that the court include an instruction on flight. Defense counsel objected, arguing that "there wasn't a hiding out," that everyone left the scene during the shooting, and that the Defendant turned himself in less than forty-eight hours later. The court reviewed the text of the pattern jury instruction and found that the evidence justified charging the jury with flight.

The trial court thereafter instructed the jury as follows:

The flight of a person accused of a crime is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the [D]efendant fled is a question for your determination.

-16-

. . . . [I]t takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community . . . to constitute flight.

If flight is proved, the fact of flight alone does not allow you to find that the [D]efendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all the other evidence when you decide the guilt or innocence of the [D]efendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case.

Whether there was flight by the [D]efendant, the reasons for it, and the weight to be given to it, are questions for you to determine.

See Tenn. Prac. Pattern Jury Instr. T.P.I.--Crim. 42.18 (16th ed.).

Even a brief evasion of authorities can support the giving of the flight instruction. Payton, 782 S.W.2d at 498. Moreover, our supreme court has held that "[a] flight instruction is not prohibited when there are multiple motives for flight" and that "[a] defendant's specific intent for fleeing a scene is a jury question." Berry, 141 S.W.3d at 589. Here, the State presented evidence that the Defendant fled the scene and remained concealed for about two days before turning himself in to police. The Defendant acknowledged that he left the scene, accidentally dropped his gun, and waited about two days to turn himself in. The Defendant's assertion that anyone would leave the scene of an active shooting is without merit, as multiple motives for flight do not preclude the issuance of a flight instruction. See id.

Accordingly, we agree with the trial court that there was sufficient evidence for a rational juror to infer that the Defendant sought to conceal himself in the community and, only after some deliberation, decided to alert the authorities and turn himself in to the police. See, e.g., State v. Smith, 893 S.W.2d 908, 918 (Tenn. 1994) (finding circumstantial evidence of an immediate flight because the facts led to a reasonable inference that the defendant had seen the flashing lights of a passing police car, which was responding to another call nearby, and concealed himself and left the scene); Hill-Williams, 2017 WL 1907735, at *12-13 (concluding that, although the defendant called 9-1-1 after he shot the victim, there was sufficient evidence to support a flight instruction because the defendant also left the scene of the shooting and went home, but did not stay there, and only later turned himself in to law enforcement after learning his twin brother was in custody for the shooting).

-17-

Moreover, the trial court instructed the jury that "flight alone does not allow you to find that the defendant is guilty of the crime charged" and "an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case." The Defendant was free to rebut the flight theory by offering his explanation for his departure and emphasizing that he turned himself in to the authorities and attempted to lead them to the location of his gun. This issue does not entitle to the Defendant to relief.

## CONCLUSION

In accordance with the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE